No. 28,016.

G. ERNEST WICKENS et al., *Appellants* and *Cross Appellees,* v. THE VALLEY STATE BANK OF BELLE PLAINE, *Appellee* and *Cross Appellant.*

THE UNION NATIONAL BANK OF WICHITA, as Trustee, et al., *Appellants* and *Cross Appellees,* v. THE VALLEY STATE BANK OF BELLE PLAINE, *Appellee* and *Cross Appellant.*

THE UNION NATIONAL BANK OF WICHITA, as Trustee, et al., *Appellants* and *Cross Appellees,* v. THE VALLEY STATE BANK OF BELLE PLAINE, *Appellee* and *Cross Appellant.*

(266 Pac. 81.)

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Breach of Individual Trust by Cashier—Liability—Evidence.* In actions brought for the purpose of holding a bank liable as participant for breaches of trust by its cashier, the evidence considered and held sufficient to support the findings of the trial court.

2. SAME—*Breach of Individual Trust by Cashier—Evidence of Relation.* Where W made an oral agreement with L, cashier of a bank, whereby L was to give his personal attention to the business of W, to collect moneys for the latter and invest and reinvest the same according to L's judgment and discretion, and where L in accordance with such agreement transacted such business for a period of years and then entered into a written trust agreement similar to the previous oral one, a finding by the trial court, based on the evidence narrated in the opinion, that L was acting in his individual capacity and not as cashier of the bank, will not be set aside.

3. SAME—*Breach of Individual Trust by Cashier—Imputing Knowledge to Bank.* And held further, that the facts and circumstances disclosed by the

Appeal and Error, 4 C. J. p. 1129 n. 60.   Banks and Banking, 7 C. J. pp. 532 n. 74, 560 n. 91.

record were not sufficient to charge the bank with imputed knowledge of the transactions between W and its cashier.

4. SAME—*Generally.* `Various objections to the judgment considered and not sustained.

Appeal from Sumner district court; OLIVER P. FULLER, judge. Opinion filed April 7, 1928. Affirmed.

*C. H. Brooks, Willard Brooks* and *Howard T. Fleeson,* all of Wichita, for the appellants.

*E. T. Taggart, John Bradley,* both of Wellington, *W. L. Cunningham* and *D. Arthur Walker,* both of Arkansas City, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: We have here three actions consolidated, all for the purpose of holding the Valley State Bank responsible as par--ticipant in breaches of trust by its cashier, C. B. Lambe. They involve separate stages of a series of transactions between Lambe and James Wickens, now deceased. The first case was brought by the grandsons of Wickens to recover $17,934, alleged to have been dissipated through Lambe's wrongful acts; the second, by the Union National Bank, the successor in trust, to recover the amount of a trust fund established by the deceased Wickens for the benefit of his sons; and the third, by the Union National Bank, successor in trust, to recover the amount of a trust fund established for the benefit of the deceased James Wickens during the remainder of his natural life. Plaintiffs recovered $3,210 in the first action, nothing in the second, and $4,400 in the third. Plaintiffs and defendants both appeal.

James Wickens was a retired farmer living near Belle Plaine. About 1917 or thereafter (the time not definitely fixed) he moved to Florida. Before going he arranged with Lambe to look after his business, the history of which is substantially narrated in the court's findings, which follow:

"1. Before James Wickens went to Florida the only business he transacted with the defendant bank was that of a depositor, and neither the defendant bank nor any officer thereof was familiar or acquainted with the details of his business or investments.

"2. Before leaving for Florida James Wickens made a verbal arrangement with C. B. Lambe to give his (Wickens') business his (Lambe's) personal attention, and authorized Lambe to collect moneys due Wickens and invest and reinvest the same according to his (Lambe's) judgment and discretion.

"3. That thereafter, and at all times complained of by the plaintiffs, Lambe,

on his own order or by check or otherwise, drew out or charged against the Wickens fund in the Valley State Bank and reinvested them in his discretion.

"4. Neither Wickens nor any of them (Lambe), nor Lambe as trustee, understood or intended that The Valley State Bank should in any way be concerned with or have any supervision or control over such collections or investments.

"5. That from the time of the aforesaid verbal arrangement up until the execution of the trust agreements referred to in the plaintiff's petition, Lambe took charge of the collections of money due Wickens and invested and reinvested the same according to his own individual judgment and without consulting any officer of the bank. That he made deposits in Wickens' account and at his discretion drew out various sums therefrom and invested and reinvested the same, and Wickens at times wrote checks thereon, and sometimes Lambe, at the request of Wickens, sent to Wickens drafts for such amounts as he (Wickens) requested. Lambe made reports to Wickens of his investments and collections two or three times a year, going into detail if it was of any considerable amount. All correspondence was carried on between Lambe and Wickens and at no time with the bank or with Lambe as an officer of the bank.

"6. The bank received no compensation or pay for Lambe's services in handling the Wickens business, and the only benefits received was as a customer of the bank.

"7. Lambe was authorized to invest the Wickens funds in either real estate or personal securities and to make the investments of the Wickens funds in which he did make them.

"8. The bank had no power, authority or right to supervise or control the investments of the Wickens funds or the manner of Lambe's handling of them.

"9. At the time Lambe made his reports to Wickens he inclosed bank statements of his account, debit slips and checks showing how the funds were being invested.

"10. There was never at any time any record of the investments of the Wickens funds under the control of the bank or in possession of the bank. Lambe kept a complete account of the investments and made reports thereof to the Wickens.

"11. The defendant bank at no time violated any contract, express or implied, between it and the Wickens or any of them, or the Wickens trustee. The only contract between the bank and Wickens or any of them, or the Wickens trustee, was the contract implied from the deposit of funds with the bank by Lambe, their duly authorized agent, to pay the same upon the order of the Wickens or Lambe.-

"12. That the bank at no time appropriated any part of the Wickens funds, either with or without Lambe's or Wickens' consent, to the payment of Lambe's or any other person's obligation to the bank, except the Edrington note, not now in dispute, and other notes hereinafter specified.

"13. That before the execution of the trust agreements the various investments listed therein were submitted to Wickens, the beneficiaries therein and to their attorneys, with full opportunity on their part to investigate said

48—125 Kan.

investments and without any concealment on the part of the bank as to their character or value.

"14. That said trust agreements were prepared by the attorneys for the beneficiaries without any suggestion from Lambe.

"15. That the investments therein described were at the time delivered to the attorneys for Wickens and the beneficiaries and by said attorneys redelivered to Lambe for handling and collection, under the terms of the trust agreements.

"16. That Lambe individually, and not as an officer of the bank, was named as trustee therein.

"16½. That on the trial of the cases it was admitted by plaintiffs that the only knowledge which they would be able to show that the bank had of the manner of handling the Wickens funds was such as would be imputed to it by reason of Lambe being an officer of the bank. The board of directors and officers of the bank had no actual knowledge of said investments.

"17. With knowledge of the investments, the beneficiaries, under the trust agreements, accepted payments from said investments and used the same from that time until Lambe surrendered his trust, and up until the time of the trial were accepting the benefits of said investments.

"18. That the defendant bank at no time solicited, induced, or knowingly permitted said investments or any of them, except the Edrington note, not now in dispute, and notes hereafter referred to.

"19. That no officer of the bank, other than Lambe, knew of the trusteeship or the investments until after the failure of the bank.

"20. C. B. Lambe used the funds of the Wickens estate to pay to the bank a certain McGowan note, originally for $1,200, upon which there is a balance due of about $800; and one note of $800 of O. L. Lane; and two certain other notes, one for $750 and one for $850, known as the McCool notes; and one note number —— for $2,600; McCool note and McCool checks to the amount of $1,800. Through the manipulations of the Wickens funds by Lambe, the bank received a benefit of these sums for notes and checks that were due and owing to the bank, but the bank had no knowledge of the way and manner in which the fund was being used by Lambe, and no notes or paper belonging to the bank were ever sold or transferred to Wickens or charged out of any of the Wickens funds, nor was any of the Wickens fund ever used to take up or off the bank's hands any of the paper except those above found."

The court concluded that:

"1. Lambe was the cashier of the defendant bank at all times complained of, but his handling of the Wickens funds was solely as an agent and in his individual capacity and not as cashier of the bank, and the only reason that the bank is liable is because of having received the benefits in the payment of the notes referred to.

"2. In all other issues except as to the notes referred to, the bank should be entitled to and is awarded judgment, and each party should pay their own costs, made in the several cases."

The plaintiffs contend that the undisputed evidence and "the obvious purport of the spoken words and overt acts" between Lambe

and Wickens show that Lambe in undertaking to act for Wickens was doing so as the cashier of the bank, and that the bank, therefore, rather than Lambe in his individual capacity, was agent for Wickens. Since the trial court found otherwise, the question is, Was there sufficient evidence to support the finding? We think there was. Among other things, Lambe testified:

"He asked if I wouldn't give it (his business) my personal attention. I told him I would. . . .

"Did he give you any particular direction about the investments? None except to invest it safely according to my judgment. . . . He told me about these different mortgages and notes he owned and held. He asked me to look after the collections. . . .

"Did he say anything else about investing, about who you would consult? No.

"Who were you to consult? No one.

"Just yourself? Just myself.

"The Court: While you are on this subject, . . . state whether or not any of those notes or contracts were ever in the bank as a part of the assets of the bank. A. No, sir.

"Court: Were those notes ever any of them ever exhibited to the bank commissioner or bank examiner? A. No; for the simple reason that they didn't belong to the bank.

"Did you keep them among the bank's assets? A. No.

"Where did you keep them? In envelopes in private papers in the vault.

"Whose private papers? My private papers.

"Were they listed or noted anywhere in any way on the bank's records? No. . . .

"Court: Do you know whether or not the directors of the bank ever knew anything about your personal transactions with Mr. Wickens or the Wickens estate? They did not.

"Did you ever take the matter up and discuss it at any board of directors' meeting? No.

"So far as you knew, the board of directors knew nothing about it whatever? Nothing whatever.

"Did you ever report it to the bank examiner? No.

"So far as you know, did the bank examiners, any of them, know anything about it? No. . . .

"As a matter of fact, were any of these contracts or securities listed here ever in the possession of the Valley State Bank? No.

"In whose possession were they when they were in Belle Plaine? In my possession. . . ."

Mr. Wilson, bank examiner, who took charge of the bank, testified:

"When you went down there and took charge, did you have among the assets of the bank any of these notes, contracts or securities sued on in either one of these actions? No, sir.

"Where were those papers and documents, if you know? They were in Mr. Lambe's lock box.

"Did you ever take possession of them as a representative of the banking department? No. . . .

"Do you know who did turn them over to the sheriff? Mr. Lambe. . . . I think the fact that they were in a private lock box, that I had nothing to do with unless there would have been some valuable securities he had that the banking department would want to take charge of.

"COURT: The banking department didn't take charge of any of these papers that have been offered in evidence."

With these matters fresh in their minds, a written trust agreement was drawn turning over certain personal property of James Wickens to his grandson and being headed "List of personal assets held by C. B. Lambe, for James Wickens." No reference was made therein to the bank, but the assets were to be held by C. B. Lambe. There were other documents reciting that "Lambe . . . acknowledges that he has delivered possession to G. Ernest Wickens and brother of all the assets which he has heretofore controlled for ·the grandfather," etc., and "that he has received them back as agent for the purpose of collecting," etc.; also a document dated December 19, 1925, signed "C. B. Lambe," resigning both trusts. Mr. Burke, one of the directors of the bank, testified:

"Did you ever know anything about the Wickens estate business there in the bank? Not until after the crash.

"Did you know anything about how Mr. Lambe was handling it? No.

"Had any of the Wickens ever made any complaint to you? No.

"Did you know that Mr. Lambe was trustee or agent of the Wickens? No. . . .

"Did Mr. Lambe at that meeting or any other meeting discuss anything about this Wickens estate? No.

"Did any of you ever discuss ,it at any of those meetings you ever had? No, sir."

Further testimony need not be quoted or analyzed. In our opinion, the court's findings were amply supported by competent evidence.

The plaintiff contends that the bank was liable because of its imputed knowledge of the relationship and transactions between Wickens and its cashier; "that the sole question in the case is, and always is, What circumstances charged the bank with the requisite knowledge of the fiduciary's wrongful intent?" It is argued that a corporation is assumed to have the relative knowledge which its agents, acting for it in any particular matter, have; that when the agent with guilty knowledge is himself acting for the corporation,

so far as affects the matter in hand, "he is the bank; . . . his knowledge is to be treated as that of the bank."

We are of opinion that the facts and circumstances in the instant case are not applicable to plaintiff's contentions and conclusions. Wickens designated Lambe his agent to collect moneys due Wickens and to invest and reinvest the same according to his (Lambe's) judgment. Under such arrangement, Lambe for about five years collected money, deposited it, checked it out, made and collected investments and reinvested the proceeds thereof, all at his discretion. He reported to Wickens two or three times a year, sending deposit slips, and entering into detail when the investments were of any considerable amount. He drew out and remitted to Wickens at Wickens' request. Sometimes Wickens himself checked on the account. There is no doubt, in our opinion, but that Lambe had authority to do all these things in accordance with his discretion and judgment. Such authority is clearly shown by the written trust agreement which carried out what before had been in parol.

Knowledge had by an officer of a corporation is ordinarily not imputed to the corporation except when the officer is transacting business for it. Lambe was not transacting business for the bank when he was making loans for Wickens, which to an extent was in competition with the bank itself. It might be said that Lambe was acting for the bank in paying out the money, but this was not what caused loss to the Wickens fund. Lambe had unquestioned authority to draw Wickens' money from the bank. It was unwise investments by him which caused the loss. Authorities are cited and the principle under consideration well discussed in a note in L. R. A. 1915C 519:

"There are three ways in which a bank may incur liability and be compelled to make good deposits that have been misappropriated by the fiduciary: (1) By a violation on its part of the contract, express or implied, between it and the owner of the fund. The reason for the bank's liability is based upon the general principle that the bank cannot discharge its obligation to a depositor except by payment in strict conformity to the contract of deposit. (2) By appropriating the fund, either with or without the fiduciary's consent, to the payment of the latter's debt to the bank. The reason for the bank's liability is based upon the general theory that the owner of a fund may follow it into the hands of and recover it from any person who has not innocently given value therefor. The action for money had and received is an appropriate form of action in this class of cases. (3) By assisting the fiduciary to accomplish the misappropriation, the bank having knowledge, actual or constructive, that the fraud is being or about to be perpetrated by the fiduciary. The reason

for the bank's liability is that it knowingly makes itself a party to a fraud and must make good the loss that results from the misappropriation." (See *Allen v. Puritan Trust Co.*, L. R. A. 1915C 519.)

In the instant case it was the duty of the bank to pay out the funds in question or charge against them on Lambe's order. It paid the money in strict accordance with the orders given by the authorized agent in control. It is clear that the bank did not knowingly participate in the misappropriation of the funds. (See *State, ex rel. Peach Co., v. Bonding & Surety Co.*, 279 Mo. 535, 215 S. W. 20; *U. S. Fidelity Co. v. United States Nat. Bk.*, 80 Ore. 361, 157 Pac. 156; *National Bank v. Insurance Co.*, 104 U. S. 54, 26 L. Ed. 693; *Bank v. Powell*, [Ga.] 117 S. E. 264; *American Surety Co. v. Grace*, [Tenn.] 271 S. W. 739; *Ihl v. Bank of St. Joseph*, 26 Mo. App. 129, 140, 141.) Nor did it have authority to supervise or control Lambe's investments of the Wickens funds. He could have withdrawn them all from the bank and deposited them elsewhere had he so desired. (*Martin v. Bank*, 66 Kan. 655, 72 Pac. 218; *Farmers State Bank v. Brenneke*, 118 Kan. 251, 254, 240 Pac. 395.)

*Knobelock v. Bank*, 50 S. C. 259, 27 S. E. 962, was a case somewhat similar to the one at bar. Jacob Small was director and president of the defendant bank, and "took a general interest in and an active supervision over the bank's business." He was also executor of the Knobelock estate. Small drew out of the defendant bank a large sum of money on deposit to his credit as "executor," and misappropriated it. The suit was to hold the bank liable on account of his misappropriation and the bank's knowledge through him. In the headnote it was said:

"A bank is presumed to know what its president knows only while he acts within the scope of his agency, and hence it is not imputable with knowledge of his fraudulent intent in drawing a fund from the bank in his private capacity as trustee of the fund, with intent to misappropriate it."

*State, ex rel. Davis, v. Bank*, 112 Neb. 840, 201 N. W. 897, is another. There Berge was "cashier and managing officer" of a small country bank. He was also administrator of an estate. As such administrator he checked out or charged against the trust funds. The contention was that in paying them out he was performing a bank duty, and therefore his knowledge of actual or intended misappropriation was imputable to the bank and this made the bank liable. The court, however, said:

"The argument seems to be that in paying the money out in this case he was

acting for the bank to the same extent that he did in receiving the note in the case cited, but the distinction is plain. In receiving the note the bank was benefited; it was the ordinary method of investing its funds; in paying it out the bank received no benefit, and had no interest except to see that it was paid upon the order of the depositor." (p. 844.)

Cashiers of banks in small country towns frequently act as guardians, executors and trustees, and sometimes for people in investing money in real-estate loans and others. It would be a hard rule to require the bank and its board of directors to supervise, pass upon or control their actions in such matters and be liable for their default. A bank statement would not truly reflect the liabilities of such bank without an investigation of the acts of its cashier as guardian, executor or administrator. There would be no way of knowing the extent of the bank's liability without such an investigation. Such a rule would, in our opinion, impose an unwarrantable burden of supervision on the part of the bank, where it had no power or authority to supervise or control. The selection of an agent or trustee is an individual matter, lying within the power of him who makes the selection. He may change his selection and may require such bond or security as he desires. Having sole power of appointment, he has no right to claim that any third person shall be liable for the default of his agent, selected solely by him, unless the third party has participated in the misappropriations to the extent of becoming a party to the fraud. The defendant bank in the instant case had no right to supervise the investment of the funds or the value of the securities taken, nor had it the right to refuse payment of the check or order of Lambe. (*Meinhart v. Farmers State Bank,* 124 Kan. 333, 259 Pac. 698.)

Various authorities cited and relied upon by plaintiffs have been considered, but need not be analyzed. They are either not applicable to the facts or not controlling.

The defendants have filed a cross appeal in which it is contended that there was no evidence to sustain the court's twentieth finding. We think the contention not good. We deem the evidence sufficient to support the finding. Various other questions presented in the briefs practically have been disposed of by what has been said and therefore need not be discussed in detail. Viewing the whole record, we discover no error which would warrant setting aside the trial court's findings and conclusions.

The judgment is affirmed.