(704 P.2d 399)

No. 57,102

CINDY LYNN HUBBARD and AETNA LIFE & CASUALTY CO., *Appellees/Cross-Appellants*, v. HOME FEDERAL SAVINGS AND LOAN ASSOCIATION, *Appellant/Cross-Appellee,* and GEORGE D. BISHOP, *Defendant.*

Opinion filed August 15, 1985.

*Bruce H. Wingerd,* of Clay Center, for the appellant/cross-appellee.

*L. Franklin Taylor* and *Susan Hall Baker,* of Payne & Jones, Chartered, of Shawnee Mission, for the appellees/cross-appellants.

Before FOTH, C.J., REES and PARKS, JJ.

FOTH, C.J.: This appeal is from a judgment against Home Federal Savings and Loan Association, of Manhattan, based on its alleged complicity in the conversion of funds by a conservator who did business with it. Plaintiffs were the appellees Cindy Hubbard, the former conservatee; and Aetna Life and Casualty Co., surety on the conservator's bond. Defendants were the appellant Home Federal; George Bishop, the conservator; and Citizens State Bank of Manhattan.

George Bishop was appointed conservator for his minor niece, Cindy Lynn Hubbard, in March 1977. Bishop deposited some $20,000 of conservatorship funds in various fiduciary accounts at Citizens. The remaining $40,000 was used to purchase a $40,000 certificate of deposit at Home Federal. The C.D. was issued to "George D. Bishop as conservator for Cindy Lynn Hubbard."

On April 17, 1978, Home Federal loaned $20,000.00 to Bishop in the name of "George D. Bishop as Conservator for Cindy Lynn Hubbard," using the $40,000 C.D. as collateral. On October 6, 1978, a second loan of $10,000 was made to Bishop, again using the C.D. as collateral. Although the loan papers indicate the loan was to Bishop in his capacity as conservator, the proceeds check was made out simply to "George D. Bishop." A third loan of $10,000 against the C.D. was made on March 5, 1979, at a time when approximately $80.00 had been paid toward the principal of the previous loans. The total of the three loans

against the C.D. as of March 5, 1979, was $39,916.24. The proceeds check for the third loan was made payable to George D. Bishop as conservator.

Bishop deposited $19,000 of the proceeds from the first loan, $8,000 of the proceeds from the second loan, and $9,900 of the proceeds from the third loan in his personal checking account at Citizens, which he maintained jointly with his wife. Bishop was married to Bobbi J. Bishop, formerly Bobbi J. Degener. Home Federal held a mortgage on her Manhattan real estate in the name of Bobbi J. Degener, but knew she was Bishop's wife. Beginning in March 1978, monthly payments on the mortgage loan were frequently delinquent. Shortly after each loan to Bishop as conservator payments were made on the Bishops' mortgage loan at Home Federal as follows: April 19, 1978, $1,002.00 (2 months); October 10, 1978, $1,509.00 (3 months); March 6, 1979 $1,509.00 (3 months).

Interest payments on the C.D. were deposited into the conservatorship checking account at Citizens. Interest payments to Home Federal on the conservatorship loans were made by preauthorized drafts on the same account at Citizens. This arrangement continued until April 1981. When the Citizens conservatorship account no longer contained sufficient funds to cover the payments, the drafts were discontinued. Home Federal continued to pay interest on the C.D. directly into the conservatorship account at Citizens until May 1, 1981. Thereafter, and until the time of trial, Home Federal credited the C.D. on its books with the interest earned and charged the conservatorship loan account on its books with interest due.

On August 20, 1981, Hubbard and Aetna filed this suit against Bishop, Home Federal, and Citizens, alleging Bishop wrongfully converted the Hubbard Conservatorship assets to his personal use and that the financial institutions facilitated and participated in the conversion to their benefit with actual or constructive knowledge of the conversion. All claims against Citizens were dismissed with prejudice on the plaintiffs' motion in June 1983. Summary judgment as to liability was entered against Bishop in January 1984, and the case continued to trial to the court on the claim against Home Federal.

It was plaintiffs' theory that Home Federal should be liable for the entire $40,000.00 lent to Bishop plus interest paid on the

C.D. because of the pattern of dealing between Home Federal and Bishop. They relied primarily on the repeated delinquencies on the Bishops' personal mortgage, plus the catching up of those delinquencies shortly after each of the three loans. In addition, they pointed out that the interest rate on the loans exceeded that available on treasury bills, suggesting that the loans were therefore imprudent financial transactions. Bishop's stated reason for the loans was a desire to obtain a higher yield than the C.D. provided, and still avoid a penalty for early withdrawal. These facts, they claimed, should have alerted Home Federal to the possibility that Bishop was converting the conservatorship funds to his own use. There was no claim that anyone at Home Federal had *actual* knowledge of the conversions, but only that it was on such constructive notice that it had a duty to inquire.

The trial court, however, largely rejected plaintiffs' theory. Instead, it found partial liability employing several different theories:

1. As to the first loan of $20,000 it found no liability, concluding as a matter of law that Home Federal "acted in good faith and had no knowledge, either actual or constructive of the fraud by defendant Bishop."

2. As to the second loan, it concluded that "defendant Home Federal wrongfully, by inadvertence and error, gave the proceeds of that loan to defendant Bishop individually, although the loan was secured by the Hubbard Conservatorship assets, and defendant Home Federal is liable for the amount of such loan in the sum of $10,000.00."

3. As to the third loan, it concluded "defendant Home Federal, by and through its agent, Mary Jones, acted wrongfully in making said loan by exceeding the limits of a loan on collateral contrary to the established policy of defendant Home Federal. Further, the Court concludes that the knowledge of Mary Jones at the time of the making of the third loan to defendant Bishop was such as to impute constructive notice to defendant Home Federal to inquire into Bishop's actions, and defendant Home Federal is liable for the amount of the third loan in the sum of $10,000.00."

4. On the subject of interest, the court concluded, without giving any reason, "that the further payment by defendant Home

Federal of interest on the Hubbard Conservatorship Certificate of Deposit after the third loan and until May 1, 1981, was wrongfully made by defendant Home Federal, and defendant Home Federal is liable for the amount of such interest payments in the sum of $6,500.00."

Upon Bishop's confession of liability, the court entered judgment against him in the amount of $121,311.00, being $60,655.50 in actual damages doubled pursuant to the provisions of K.S.A. 59-1704. It entered judgment against Home Federal in the amount of $26,500.00, representing the second and third loans plus the interest paid. It is from this latter judgment that Home Federal now appeals. The plaintiffs filed a cross-appeal, contending the judgment against Home Federal should be doubled pursuant to the provisions of K.S.A. 59-1704.

We are unable to agree with the trial court on any of its findings of liability.

### I.   The Second Loan of October 5, 1978

The trial court concluded that Home Federal was liable for the entire amount of the second loan of $10,000 because Home Federal, through "inadvertence and error," made the proceeds check payable to "George D. Bishop" and did not include a notation indicating the check was given to him in his capacity as conservator.

In *Wickens v. Valley State Bank*, 125 Kan. 751, 757, 266 Pac. 81 (1928), the court discussed ways in which a bank may incur liability and be compelled to make good deposits that have been misappropriated by a fiduciary. Generally such liability will only be incurred if:

(1) The bank violates the contract, express or implied, between it and the owner of the fund;

(2) the bank appropriates the fund to the payment of the fiduciary's debt at the bank; or

(3) the bank assists the fiduciary in accomplishing the misappropriation with actual or constructive knowledge that the fiduciary is perpetrating or about to perpetrate a fraud.

The trial court cited no authority for its conclusion that failure to make the check payable to Bishop as conservator resulted in Home Federal's liability. We find no Kansas cases which would impose such liability, and do find cases from other jurisdictions to the contrary.

*E.g.*, in *National Casualty Co. v. Caswell & Co.*, 317 Ill. App. 66, 45 N.E.2d 698 (1942), a surety brought suit to recover funds diverted by a trustee (Kester) against an investment securities business that had purchased a certificate of deposit subject to the trust from Kester with a check payable to him individually rather than as trustee. In finding that liability could not be imposed on the investment securities business, the court said:

"Plaintiff says that if defendant's check had been made payable to Kester 'as trustee' plaintiff would have been protected, but this is not true. Under section 9 of the Fiduciary Obligations Act the check to Kester as trustee could have been indorsed by him as trustee and deposited in his personal account and the depositary bank would not be bound to inquire whether Kester was breaching his fiduciary obligation in so doing. This section of the statute authorizes the bank under such circumstances to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable unless the bank has actual knowledge that the fiduciary in so doing is committing a breach of his obligation. This would also be true under the provisions of sections 4 and 9 if the check had been made to Kester's principal, the Central & Northwest Corporation, for he could have indorsed the check in the name of his principal and deposited it in his personal account." *National Casualty Co. v. Caswell & Co.*, 317 Ill. App. at 71.

Although *National Casualty Co. v. Caswell & Co.* was decided under the provisions of the Uniform Fiduciaries Act which has not been adopted in this state, the principles of law supporting the decision represent the common law.

The text writers agree:

"Similarly, if a trustee draws a check upon his account as trustee payable to himself personally, the bank is not bound to make inquiry whether the trustee is committing a breach of trust thereby, whether the check is presented by the trustee over the counter for payment, or is presented by a third person to whom it has been indorsed by the trustee, or is presented properly indorsed through another bank. Nor is the bank bound to make such inquiry where the trustee deposits the check in the bank to the credit of his personal account with the bank." Comment g to Restatement (Second) of Trusts § 324 (1957).

"Accordingly a drawee bank is not liable merely because it honors a check drawn by a depositor as fiduciary and payable to a third person. Nor is it liable where it honors such a check payable to the depositor personally, either by paying cash over the counter to the depositor, or by paying a subsequent holder, or by paying another bank through which the check is collected for the depositor or for subsequent holder, or by crediting the depositor's individual account in the drawee bank. And a bank is not liable when after allowing a depositor to deposit fiduciary funds in his individual account, it subsequently honors his personal checks drawn on that account. The bank is not bound in any of these cases to inquire into the use the fiduciary depositor is making or intends to make of the proceeds of the checks." IV Scott on Trusts § 324.3 (3rd ed. 1967).

The same principles have long been accepted by the Kansas courts. In *Bank v. Bank*, 60 Kan. 621, 627, 57 Pac. 510 (1899), the court stated:

"A case which substantially involves the principle, though differing somewhat from it in point of fact, is *Munnerlyn v. Augusta Bank*, 88 Ga. 333; *s.c.* 30 Am.St.Rep. 159, 14 S.E. 554. In that case it was ruled:

" 'When a trustee deposits money in a bank to his credit as agent, the bank would be discharged by paying it back to the individual who made the deposit, and, in the absence of knowledge or notice to the contrary, has the right to assume that he will appropriate the money to its proper uses and trusts.'

"There can be no substantial difference between a case where an agent makes a deposit of money as 'agent,' thus informing the bank that the fund is not in reality his, and one in which the agent makes the deposit in his own name but at the same time informs the bank that he is only the agent of another for it. In both cases the bank would have the right to assume that the agent in dealing with the fund was acting within the terms of his agency."

In this case plaintiffs concede that Home Federal could have delivered the $10,000.00 to Bishop in cash without incurring liability in the absence of actual notice of the intended conversion. (The court found no notice, only "inadvertence and error.") If it could have delivered cash, there is no reason it could not issue a check payable to the conservator individually.

In addition, the omission of the fiduciary designation had no apparent effect on Bishop's ability to negotiate the check. Both the first and third loan checks were deposited to his personal account in Citizens despite the presence of the designation on each. There is thus no showing of any causal connection between Home Federal's mistake on the check for the second loan and the loss to the conservatorship. The conversion of all three checks was accomplished at Citizens without any complicity on the part of Home Federal.

Plaintiffs suggest that Home Federal should be liable for the proceeds of the second loan because it benefited from the misappropriation when it received delinquent mortgage payments from Bishop. The evidence shows that delinquent mortgage payments were made after *each* of the three conservatorship loans was deposited in Bishop's personal account. If Home Federal is liable on the second loan simply because it received some benefit, clearly it should incur liability on all three of the loans. However, plaintiffs do not contend that the trial court erred in finding no liability on the first loan.

A majority of the cases discussing a bank's liability when it

benefits from the misappropriation of trust funds have arisen when trust funds are deposited in the personal account of a trustee and used to reduce the trustee's personal indebtedness at the same bank. Here the proceeds of the conservatorship loans given to Bishop by Home Federal were not deposited in a personal account at Home Federal, but in his personal account at Citizens.

No Kansas cases have addressed the liability of a bank in this situation. Three cases do, however, provide some guidance. In *Washbon v. Bank*, 87 Kan. 698, 710, 125 Pac. 17 (1912), the court held: "Where a bank knowingly participates with a depositor in a misappropriation of trust funds *and reaps the fruit of the breach of trust* it becomes liable to the beneficiary for whatever wrong is done him." Emphasis added. The case focuses in large part on the knowing participation of the bank in the misappropriation and does not indicate that liability could be based solely on the benefit to the bank without actual or constructive knowledge of the misappropriation.

In *Wickens v. Valley State Bank*, 125 Kan. at 757, the court indicated that a bank could be held liable for misappropriation of funds by a trustee if *the bank* appropriates the fund, with or without the fiduciary's consent, to the payment of the latter's debt to the bank. In such a case " 'liability is based upon the general theory that the owner of a fund may follow it into the hands of and recover it from any person *who has not innocently* given value therefor.' " Annot., 1915C L.R.A. 519, cited in 125 Kan. at 757. Emphasis added. The case implies that if the bank acts innocently, with no actual or constructive knowledge of the misappropriation, it cannot be held liable for the benefit it receives even if *it* is the appropriator.

Finally, in *Kimmel v. Bean*, 68 Kan. 598, 75 Pac. 1118 (1904), the court held that a bank was protected in applying a deposit it received from an agent in his own name, without notice of the agency, to a past due debt of the depositor to the same extent as it would be in paying it out upon his checks. In reaching this conclusion the court stated:

" 'If a trustee or other fiduciary person, in violation of his own duty, uses trust money to pay an antecedent debt of his own to a creditor who has no notice of the breach of trust, or that the money is subject to the trust, in such a manner that the money is received as a general payment, and not as a distinct and separate fund, then the money becomes free from the trust, and cannot be followed by the

beneficiary into the hands of the creditor, although, in general, an antecedent debt does not constitute a valuable consideration.' (Pom. Eq. Jur. 2d ed., § 1048.)" *Kimmel v. Bean*, 68 Kan. at 606.

The court went on to agree with the holding in *Meyers v. New York County Nat. Bank*, 36 App. Div. 482, 55 N.Y.S. 504 (1899), where the New York court held in essence:

"A bank, having previous authority to apply a customer's deposit to his debt, can appropriate it to the debt, though the deposit was in part money of the depositor's ward, the bank having no knowledge of the fact." *Kimmel v. Bean*, 68 Kan. at 607.

Under *Kimmel* there must be knowledge that the funds applied to a fiduciary's debt are trust funds before a bank will be liable, even if it benefits from the trustee's misuse of the trust funds. Again, the trial court here found no knowledge on Home Federal's part as to a breach of trust.

We conclude the court erred in imposing liability for the October 1978 loan.

## II. The Third Loan of March 5, 1979.

A.   The trial court found Home Federal liable for the proceeds of this $10,000 loan first because the head teller, Mary Jones, processed the loan which exceeded the limits of a loan on collateral contrary to Home Federal's established internal policy. Home Federal's policy for share loans permitted loans up to 100% of the face amount of the collateral, but required the approval of the President or one of three Vice Presidents if the amount of the loan exceeded 90% of the face value of the collateral. Jones turned the proceeds of the third loan over to Bishop, without executive approval, even though the total loan at that point was $39,916.24, in excess of 90% of the face value of the $40,000 C.D.

The general rules regarding enforcement of loans made in excess of *statutory* limitations are found in 10 Am. Jur. 2d, Banks § 684:

"The fact, however, that a bank, in making a loan, violates a statutory provision does not, as a general rule, prevent it from recovering the money loaned or afford the borrower any defense to recovery, unless the statute so declares. This is true where the bank violates a statutory or charter provision by making a loan to a person, usually an officer of the bank, who is forbidden to borrow from the bank or to whom the bank is forbidden to loan money, as well as where it violates such provisions by making a loan or loans in excess of the limit which it may legally make to any one person. Such provisions are intended, as a rule, for the

government of the bank. Permitting a borrower who has secured an excessive loan to avoid payment of the money actually received by him would injure the interest of creditors, stockholders, and all who have an interest·in the safety and prosperity of the bank. It is accordingly well settled that the borrower cannot set up in defense of an action to recover the money so loaned, or any part thereof, the fact that the loan was in excess of the amount authorized. . . . Again, where a bank discounts a note, its knowledge that the money is to be used for an unlawful purpose does not render the transaction illegal so as to prevent a recovery by it upon the note. A loan by a bank, for which the security has been omitted in violation of the requirement of a statute in that regard, is not unenforceable by the bank. Moreover, although the security obtained by a bank in making a loan is not authorized by statute, or is not included in the list of securities upon which · the bank may loan, the loan and the security are nevertheless valid and enforceable."

Speaking to the statutory loan limits imposed by the National Bank Act, 12 U.S.C. § 84 (1982), the court in *First Am. Nat. Bank of Iuka v. Alcorn, Inc.*, 361 So. 2d 481, 489 (Miss. 1978), stated that the purpose of the loan limit statute is for the regulation of banking institutions and their officers; violation of the statute does not render the loan void as to the borrower but subjects the bank and its officers to penalties.

If violation of *statutory* loan limits creates no rights in the borrower, it follows that violation of the internal policies of the banking institution also create no additional rights in a borrower. Robert Haines, the president of Home Federal, testified that had Jones sought approval it would have been given because in Haines' opinion the bank could not refuse to make a loan fully secured by the collateral. Furthermore, nothing in the trial court's findings indicates Jones acted in bad faith in processing the loan in violation of the internal policy. The loan was lawful, and the trial court erred in basing liability on the violation of internal policy.

B.  The trial court also found that the "knowledge" of Home Federal's agent, Mary Jones, on March 5, 1979, was sufficient to impute constructive knowledge of the intended misappropriation to Home Federal and render it liable for the entire amount of the third loan.

In order to recover on the theory that a bank is liable because it assisted a fiduciary in accomplishing a misappropriation, plaintiffs must establish:

"(a) facts which show that the bank had knowledge of the trust character of the funds on deposit and that the fiduciary unlawfully withdrew and misappro-

priated trust funds; (b) facts sufficient to overcome the presumption in which the bank is entitled to indulge, namely that in withdrawing trust funds the fiduciary is acting lawfully and in the performance of his duties as a trustee, and that he will appropriate the money, when drawn, to a proper use; (c) facts which show, directly or by necessary inference, that the bank participated in the breach of trust in receiving or permitting the trustee to withdraw the trust funds, by receiving the deposit or permitting the withdrawal with notice of the breach of trust." *Cassel v. Mercantile Trust Company*, 393 S.W.2d 433, 437 (Mo. 1965).

In *Bischoff v. Yorkville Bank*, 218 N.Y. 106, 112-13, 112 N.E. 759 (1916), the court stated:

"A bank does not become privy to a misappropriation by merely paying or honoring the checks of a depositor drawn upon his individual account in which there are, in the knowledge of the bank, credits created by deposits of trust funds . . . Although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they are properly and lawfully drawn."

In *Newton v. Scott*, 254 App. Div. 140, 142-43, 4 N.Y.S. 2d 420 (1938), the court stated:

"It is settled law that 'a bank dealing with a fiduciary is not bound to inquire whether the fiduciary is applying the fund to the purposes of the trust, *unless the bank has some notice of threatened misappropriation, and, with that notice, aids the misappropriation.*' [Citations omitted.]

"This rule does not relieve a depositary from all responsibility in connection with fraudulent acts by a trustee in dealing with trust funds. It may not ignore acts by a trustee which indicate his malfeasance. If a depositary has actual or constructive knowledge of a course of dealing with trust funds by a trustee, of such a character as would lead a person of reasonable prudence and caution to suspect that trust funds then on deposit are about to be misappropriated, a duty is laid upon the depositary to make reasonable inquiry to ascertain the true facts. If it fails to make such inquiry as a means of verifying or dispelling that suspicion, the depositary may be charged with knowledge of facts which reasonable inquiry would have revealed and it may be held responsible for loss resulting from the trustee's infidelity. [Citations omitted.]"

Finally, in *Armourdale State Bank v. Homeland Ins. Co.*, 134 Kan. 245, 249-50, 5 P.2d 786 (1931), the court stated:

"The rule with reference to knowledge which the law attributes to a person from the knowledge of certain facts is well stated in 20 R. C. L. 346, section 7:

" 'Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascertained. This, in effect, means that notice of facts which would lead an ordinarily prudent man to make an examination which, if made, would disclose the existence of other facts is sufficient notice of such other facts. A person has no right to shut his eyes or his ears to avoid information, and then say that he had no notice; he does wrong not

to heed the 'signs and signals' seen by him. It will not do to remain willfully ignorant of a thing readily ascertainable. It has been said that want of actual knowledge in such a case is a species of fraud. The rule has sometimes been said to be that whatever puts a person on inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding. It has also been said that wherever inquiry is a duty, the person bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge with the duty of using them are, in equity, equivalent to knowledge itself.' "

Here teller Jones knew the loan to George Bishop was in his capacity as conservator and knew that the funds loaned were secured by conservatorship assets. However, she and Home Federal also had the right to presume that Bishop would properly apply the funds to conservatorship purposes. The only "knowledge" attributed to Jones by the trial court as of the time the third loan was made on March 5, 1979, was that Bishop was a conservator and was borrowing against the entire face value of the conservatorship C.D. The trial court further found that Jones personally received the Bishop payment of March 6, 1979, which included two months of delinquencies, and apparently based its finding of a duty to inquire on this fact. However, this was the day *after* the third loan had been made. Home Federal may have been charged as an institution with knowledge that Bishop's mortgage loan was two months delinquent, but at the time of the third loan Jones had no personal knowledge of that fact and no grounds to suspect Bishop intended to misappropriate the money. The trial court based Home Federal's duty to inquire solely on the "knowledge" of Mary Jones at the time she processed the loan. The evidence does not support a finding that Jones had any knowledge *at the time* of the third loan which would put Home Federal on constructive notice.

Finally on this issue, it appears that under the authorities cited above Home Federal could have redeemed the C.D. and delivered the entire proceeds to Bishop regardless of any *suspicions* it might have had, at least in the absence of actual knowledge of an intended conversion. Even then, we would find it difficult to formulate a good legal reason for it to refuse to honor its contract. With actual knowledge it might be required to disgorge any benefit it received from the fiduciary's defalcation, but we know of no theory under which it would be liable for the entire wrong.

Here, of course, Home Federal had no actual knowledge, and

no actual suspicion until it was too late. The most we can find is constructive knowledge at the time of the third loan of circumstances whhch might have aroused suspicion. In our opinion that was too little to form a basis for liability for the $10,000.00 loaned.

### III. Interest

The trial court concluded that, after Home Federal had constructive knowledge Bishop was misappropriating conservatorship funds, it wrongfully continued to pay interest on the C.D. Interest payments were made into the conservatorship account at Citizens and ultimately applied against the conservatorship's, not Bishop's personal, loans. There was no evidence that Bishop misappropriated any of the funds deposited in the conservatorship account at Citizens. Home Federal did receive the benefit of interest payments on the conservatorship loan, but this was a debt of the conservatorship, not a personal debt of Bishop — the interest on the C.D. went to reduce the debt of the conservatorship. There was no misappropriation of these funds, and no reason is given by the trial court for holding Home Federal liable for them. Under the legal principles previously discussed, the trial court erred in finding the payments were wrongfully made, and in rendering judgment against Home Federal for the $6,500.00.

In view of the result reached, the cross-appeal is moot.

Reversed.