(22 P.3d 608)

No. 84,948

LONNIE SPRAGUE, *Appellant,* v. FARM CREDIT SERVICES OF CENTRAL KANSAS PCA AND FARM CREDIT BANK OF WICHITA, *Appellees.*

Opinion filed April 20, 2001.

*Jeffery L. Carmichael,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant.

*Martin R. Ufford,* of Redmond & Nazar, L.L.P., of Wichita, for appellee.

Before GREEN, P.J., BEIER, J., and DAVID PRAGER, Chief Justice Retired, assigned.

BEIER, J.: Plaintiff-appellant Lonnie Sprague seeks reversal of the district court's summary judgment in favor of defendant Farm Credit Services of Central Kansas PCA (PCA). The parties agreed at oral argument that defendant Farm Credit Bank of Kansas (FCB) is to be dismissed from the action. We affirm.

This case arises out of fraud committed on both parties by Albert "Junior" Lewis. Lewis, who had a revolving line of credit with PCA for his cattle business, cheated PCA as well as Sprague, whose cattle were sold without authorization. By means of this lawsuit, Sprague sought to follow and retrieve some of Lewis' ill-gotten gains from PCA, because the balance on the line of credit was partially paid with funds Lewis obtained by defrauding Sprague.

Lewis purchased cattle with Sprague's authorization and money in early 1997. Prior to that time, Sprague had funded such purchases; Lewis had conditioned the cattle for market; and the two men had split any profits from eventual sales made with Sprague's permission. This time, Lewis began selling the cattle without informing Sprague in April 1997 and continued selling them on various occasions thereafter. Checks for proceeds from these sales were made payable to Lewis and PCA jointly, and it is undisputed that nearly $350,000 was applied to Lewis' line of credit balance at PCA. In the same period, PCA permitted Lewis to borrow approximately $400,000 in addition to the amounts he had borrowed previously.

Lewis concealed his fraudulent conduct until November 1997. Part of his pattern of deceit included a statement he had made to a PCA employee who visited Lewis' operation in October 1996, when the line of credit was renewed. Lewis had submitted a balance sheet that showed a net worth in excess of $1 million, and he told the employee that all of the cattle observed on his land belonged to him.

In November 1997, Lewis came clean with PCA and Sprague. He admitted that he had provided PCA with false financial statements and monthly inventory reports, and PCA and FCB representatives who visited his property in the wake of the disclosures confirmed that Lewis owned only 20 head of cattle. Lewis also told

PCA in November 1997 that he had "partnered cattle" with various individuals during the previous year to conceal his losses.

PCA and FCB began collection and foreclosure actions against Lewis. Lewis subsequently filed for bankruptcy. The PCA debt was exempted from discharge due to fraud. The record does not disclose whether Sprague attempted to recover out of Lewis' bankruptcy. Lewis also entered a guilty plea in federal court to bank fraud.

In this action, Sprague has argued that he is entitled to recover from PCA under what is known as "the trust pursuit rule." He maintains that there are genuine issues of material fact under that rule that preclude summary judgment in favor of PCA.

Our standard of review in summary judgment cases is well known and often stated:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

The trust pursuit rule permits a true owner of wrongfully converted property to follow it into a subsequent possessor's hands. It applies where a constructive trust has affixed itself to property in a certain state or form. The rightful owner may follow the proceeds from sale of the trust property so long as no superior equities have intervened. 76 Am. Jur. 2d, Trusts § 292, p. 306.

Sprague argues that the rule applies here because PCA does not qualify as a bona fide purchaser for value who had no notice of Lewis' defalcation and Sprague's resulting claim. See 76 Am. Jur. 2d, Trusts § 311, p. 322. According to Sprague, there are genuine issues of material fact on whether PCA obtained the proceeds from the sales in good faith for value, whether it had notice of Sprague's

interest in the cattle, and whether it changed its position or acted in reliance to its detriment upon receipt of the proceeds.

PCA does not dispute that Lewis became a constructive trustee of the sales proceeds when he sold the cattle without authorization from Sprague. However, according to PCA, Sprague does not have the right to follow the money because his trustee-agent Lewis used it to pay a personal debt to a creditor with no knowledge of Sprague's interest.

*Kimmel v. Bean*, 68 Kan. 598, 75 Pac. 1118 (1904), and *Hubbard v. Home Fed'l Savings & Loan Ass'n*, 10 Kan. App. 2d 547, 704 P.2d 399 (1985), guide us on Kansas' application of the trust pursuit rule.

In *Kimmel*, Kimmel shipped hogs to the Wichita Livestock Commission, with directions to sell them and send a draft for the net proceeds. The hogs were sold, and the Commission sent a check for the proceeds to Kimmel. When the Commission deposited the check it had received from the purchaser in its bank, the bank, with no notice of Kimmel's claim to the money, applied the proceeds to an earlier overdraft of the Commission. The result: When Kimmel presented his check from the Commission for payment, it was dishonored and Kimmel sued the bank for that amount. The district court rendered judgment in favor of the bank, a result upheld by the Supreme Court on appeal. 68 Kan. at 607.

The Supreme Court cited *Smith v. Des Moines National Bank*, 107 Iowa 620, 78 N.W. 238 (1899), which stated: " 'A *cestui que trust* cannot recover trust moneys which were deposited in a bank by the trustee in his own name and which, without notice of their trust character the bank applied to a matured individual note of the trustee, surrendering the note to the latter.' " 68 Kan. at 603-04. This Iowa decision, the court said, was in accord with the weight of authority and better reason. 68 Kan. at 604.

The *Kimmel* court also relied on *Stephens v. Board of Education*, 79 N.Y. 183, 186-87, 35 Am. Rep. 511 (1879), which said:

" 'The rule has been settled by a long line of cases, that money obtained by fraud or felony cannot be followed by the true owner into the hands of one who has received it *bona fide* and for a valuable consideration in due course of business. . . .

" 'It is said that the case is to be governed by the doctrine established in this state that an antecedent debt is not such a consideration as will cut off the equities of third parties in respect of negotiable securities obtained by fraud. But no case has been referred to where this doctrine has been applied to money received in good faith in payment of a debt. It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor. Money has no earmark. The purchaser of a chattel or a chose in action may, by inquiry, in most cases, ascertain the right of the person from whom he takes the title. But it is generally impracticable to trace the source from which the possessor of money has derived it. It would introduce great confusion into commercial dealings if the creditor who receives money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by felony or fraud. The law wisely, from considerations of public policy and convenience, and to give security and certainty to business transactions, adjudges that the possession of money vests the title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration. If the consideration is good as between the parties, it is good as to all the world.' " 68 Kan. at 605-06.

Mindful of these precedents from other jurisdictions, the *Kimmel* court held that the bank was protected in applying the money to the past due debt of the Commission, the agent of the undisclosed principal, Kimmel. 68 Kan. at 607. If a trustee, in violation of his or her duty, uses trust money or proceeds from sale of trust assets to pay an antecedent debt of his or her own, and the creditor has no notice that the money is subject to the trust or that the trust is being violated, the creditor takes free of the trust. The money cannot be followed by the beneficiary into the hands of the creditor. 68 Kan. at 606.

We applied the holding of *Kimmel* as recently as 1985 in *Hubbard*. There, when a bank had permitted a conservator to take out loans to pay personal debts, using a conservatorship asset as collateral, we said: "Under *Kimmel* there must be knowledge that the funds applied to a fiduciary's debt are trust funds before a bank will be liable, even if it benefits from the trustee's misuse of the trust funds." 10 Kan. App. 2d at 555.

*Kimmel* and *Hubbard* make clear that Kansas law permits a third party to keep proceeds paid to it from the unauthorized sale or encumbrance of trust property by the trustee, absent a showing

that the third party acted in bad faith, had notice of the trust, or did not give consideration for the payment. *Kimmel* and *Hubbard* also, at least by implication, stand for the proposition that forgiveness of an antecedent debt can constitute valuable consideration in such a context. See 68 Kan. at 605-07; 10 Kan. App. 2d at 554-55. It does not appear that Kansas additionally requires that the third party have changed its position or acted in reliance to its detriment upon receipt of the proceeds, other than whatever change or reliance is inherent in the giving of consideration. See 68 Kan. at 605-07; 10 Kan. App. 2d at 554-55; compare *Tuloka Affiliates, Inc. v. Security State Bank*, 229 Kan. 544, 548-49, 627 P.2d 816 (1981) (discussing equitable rule of setoff requiring change of position or superior equities on part of bank).

Thus, in order to survive PCA's summary judgment motion in this case, Sprague needed to come forward with evidence sufficient to raise a genuine issue of material fact on whether PCA acted in bad faith, had notice, or did not give consideration. On the first two issues, Sprague relies on PCA's apparent knowledge that Lewis had cattle belonging to others in his possession before October 1996. Regarding consideration, Sprague argues that PCA never gave consideration (or altered its position to its detriment) for the payments it received beyond the credit it had already decided to extend to Lewis. Neither this evidence nor this argument supports reversal of the district court.

The undisputed evidence demonstrates that, whatever Lewis may or may not have told PCA representatives before October 1996, thereafter he duped PCA just as he duped Sprague, robbing Peter to pay Paul. Lewis continued to make payments on his PCA credit line from proceeds of cattle sales, as he always had, while he actively concealed the true state of his financial affairs and the fact that he was conditioning and selling cattle purchased by others such as Sprague. He submitted grossly inflated financial statements and lied with a straight face when asked whether the cattle on his property belonged to him. This conduct encouraged PCA to continue advancing funds in 1997, which it did to its detriment. Without the deceit, Lewis would have exceeded his credit line limit, and no further funds would have been advanced.

Under these facts, this is not a situation where a third-party creditor was in cahoots—even constructively—with the agent fraudfeasor. On the contrary, the third-party creditor was merely a fellow victim of the defrauded undisclosed principal. Sprague cannot recover from PCA under the trust pursuit rule. Superior equities have intervened under Kansas law.

We also note in closing that we disagree with the trial court's application of K.S.A. 84-3-301 *et seq*. The parties acknowledge correctly that this case does not involve enforceability of an instrument under those statutory provisions. Further, we find K.S.A. 84-2-403 inapplicable, because Sprague was seeking to recover the proceeds of the cattle sales from a third-party creditor of Lewis rather than the cattle themselves or their worth from those who purchased them from Lewis.

Affirmed.