**DOCKSTADER et al. v. BROWN et al.**

No. 14849.

Court of Civil Appeals of Texas.
Fort Worth.

June 27, 1947.

Rehearing Denied Sept. 12, 1947.

Glenn O. Wilson, of Nocona, and King, Dawson & Jones, of Wichita Falls, for appellants.

Benson & Benson and T. B. Coffield, all of Bowie, for appellee First Nat. Bank of Bowie, Tex.

H. M. Muse, of Wichita Falls, for appellees Leon L. Deato and Wm. G. Nabors.

Donald & Donald; of Bowie, for appellee R. L. Brown, Jr.

McDONALD, Chief Justice.

Plaintiff Audrey Brown Dockstader and the defendant R. L. Brown, Jr., are sister and brother. In April of 1942 their parents, residents of Montague County, Texas, met death by drowning. Plaintiff, who had lived in California for several years, came to Montague County shortly after the date of her parents' deaths. R. L. Brown, Jr., also lived in that county. On April 29, 1942, while in Montague County, plaintiff executed and delivered to Brown an instrument in writing, which we shall refer to for identification as a power of attorney, which, omitting the formal parts, signature and acknowledgment, reads as follows:

"I, Audrey Brown Reese, a feme sole, of San Francisco, California, 234 Beverly Street, being a daughter of R. L. Brown and Minnie Brown, late of Montague County, Texas, now both deceased, have made, constituted, and appointed, and do by these presents, make, constitute and appoint R. L. Brown, Jr., my brother, of Montague County, Texas, my true and lawful attorney for me, in my name, place and stead, to do any and every act, and exercise any and every power that I might, or could do or exercise through any other person, and that he shall deem proper or advisable, intending hereby to vest in him a full and universal power of attorney, hereby ratifying and confirming whatsoever my said attorney shall or may do by virtue hereof in the premises and I agree to and represent to those dealing with my said attorney in fact that this power of attorney may be voluntarily revoked alone by revocation entered of record in the office of the County Clerk of Montague County, Texas, and until said revocation is thus recorded, all acts of said attorney are hereby ratified and affirmed."

Plaintiff was a feme sole when she executed the power of attorney and when the hereinafter described sale of minerals was made, and was then known as Audrey Brown Reese.

In a division of the estate of her parents, plaintiff acquired a tract of 82 acres of land in Montague County. On May 30, 1944, R. L. Brown, Jr., purporting to act as attorney-in-fact for plaintiff, executed and delivered to defendant Leon L. Deaton a conveyance of an undivided one-fourth interest in the oil, gas and other minerals in said tract, subject to an outstanding oil and gas lease, and executed and delivered a conveyance of a like interest to the defendant William G. Nabors. Although two deeds were executed, it appears that Deaton and Nabors were acting together in acquir-

ing the mineral interests thus conveyed, and the total purchase price was paid by a single check executed by Deaton.

The primary purpose of this suit is to cancel the two mineral deeds and to recover title to said mineral interests from defendants Deaton and Nabors. Alternatively, in event of failure to cancel the deeds and recover such interest, plaintiff seeks judgment against Brown on the theory that he converted to his own use the money collected from the sale of such mineral interests, and also, in event of failure to cancel the mineral deeds, plaintiff seeks a judgment against the defendant First National Bank of Bowie on the theory that it participated in the conversion by Brown of the money belonging to plaintiff.

Plaintiff, after a trial to a jury, recovered judgment against Brown for the sum of $3,570.14, but was denied a recovery against the other parties defendant. Plaintiff appeals, relying on thirteen points of error.

Rather than to undertake to discuss one by one the thirteen points of error, we shall discuss the various contentions made by appellant, and some of the contentions made by the several defendants by way of replication thereto.

Appellant, whom we shall continue to refer to as plaintiff, argues first of all that the language of the power of attorney was so general and uncertain that it was insufficient to confer on Brown power to do anything in plaintiff's behalf, and second, contends that if she be mistaken in the view just stated, the power of attorney was executed only for the purpose of authorizing Brown to act for her in the matter of dividing the estate inherited by plaintiff and her brothers and sisters from their parents, and that defendants Deaton and Nabors were charged with notice, or had actual knowledge of facts and circumstances sufficient to apprise them of the limited scope of the authority conferred by the power of attorney.

■ We have not been cited to any case, nor have we found one, holding that a power of attorney similar to the one before us is ineffective to confer any authority on

the agent. In one of the cases cited by appellant the power of attorney was couched in language equally as broad as that found in the one before us, and the Court of Civil Appeals and the Supreme Court upheld a sale made thereunder. Veatch v. Gilmer, Tex.Civ.App. 111 S.W. 746, 747, same case, Gilmer's Estate v. Veatch, 102 Tex. 384, 117 S.W. 430. The following is taken from the opinion of the Court of Civil Appeals:

"Our opinion is that the power of attorney authorized the conveyance of the principal's land. We have not found in the decisions an instrument like this one. The cases are numerous in which language as broad and general has been used, but used in connection with other provisions which were held to abridge the exercise of the power. This instrument is free from qualifying features either upon its face or in the evidence. It gives the agent unrestricted and unlimited power to do any lawful act for and in the name of the principal as if he were present. It was a complete substitution of the agent in his place and stead for the doing of any act for and in the name of the principal, which the principal himself might do, if present and acting. He did not see fit to place any limitations upon the acts of his agent, and the courts have no right to do so for him."

Powers of attorney are subject to the general rules applicable to the construction of written instruments, including the rule that the meaning of the instrument must be gathered from the instrument itself if possible. But it is not necessarily to be presumed that a principal would delegate to an agent authority to do every act which the principal could do himself, without limitation of any kind whatever. Wide authority is often vested in an agent, but usually with reference to a limited subject, or to be exercised within a limited scope of activity. But where a principal has executed a power of attorney in language like that in the instrument now under study, it would seem reasonable to impose upon the principal both the burden of proving that the power conferred was for a limited purpose, or to be exercised within a limited scope or sphere of activity, and the burden

of proving that one who has dealt with the agent in reliance on the apparent grant of authority had notice or knowledge, actual or constructive, of the limitations on such grant of authority.

Plaintiff testified that the power of attorney was executed only for the purpose of enabling her brother to represent her in bringing about a division of their parents' estate, but no issue was submitted to the jury inquiring if the power of attorney was executed for such limited purpose, nor did plaintiff request the submission of any such issue, so far as the record shows. Granting only for the sake of argument that parol evidence was admissible to limit the apparently broad grant of authority, or to put it another way, to show the purpose for which authority was granted or the sphere within which it was intended to be used, there is at least a conflict in the evidence concerning the matter, because Brown testified that plaintiff wrote him several letters advising that he sell some of the mineral interest in said land and that he act in such respect under the power of attorney. Rules of Civil Procedure, rule 279, provides in part: "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived; * * *." If there is any jury issue touching on the question of the notice or knowledge of the purchasers, it must be the ninth, which the jury answered in the affirmative, and which reads as follows:

"Do you find from a preponderance of the evidence that the defendants Nabors and Deaton were innocent purchasers for value of the minerals described in the mineral deeds in question?"

If the issue just mentioned did not refer to the question stated, then there was no issue bearing on it, and the ground of recovery based thereon must be treated as waived. Rule 279.

Plaintiff argues that the purchasers had knowledge, or were charged with notice, of the following facts which revealed the limitation on the grant of authority: (1) The power of attorney revealed the recent deaths of the parents.

(2) A certain recorded affidavit showed that no administration was had on the parents' estate. (3) A partition deed dividing the estate of the parents was signed by plaintiff herself, and not by Brown. (4) Another affidavit showed that the parents died intestate. (5) A certain deed of trust was signed by plaintiff herself, and not by Brown. (6) An oil lease on the land, in favor of Brown, was signed by plaintiff herself. (7) Such lease was assigned by Brown to another fourteen days after its execution. We do not consider that the facts recited were sufficient to establish beyond dispute either that the power was given only to enable Brown to represent plaintiff in dividing the family estate, or that the purchasers knew or should have known that such was the limited purpose of the power of attorney. At most it could only be said that jury issues were raised. The fact that the parents had recently died intestate, and the fact that no administration had been had, were not inconsistent with a grant of authority to Brown to sell mineral interests in the land received by plaintiff from that estate. The fact that she signed the partition deed is at least equally consistent with a theory that the power granted was not limited to the matter of dividing the estate, as that it was. Brown was a party to the partition deed in his own right. Had he signed the deed, both for himself and on behalf of his sister, he would have been in the attitude of being both a grantor, as attorney-in-fact, and a grantee, individually, in the same conveyance. The natural inference is that it was this conflict of interests which resulted in the partition deed being signed by plaintiff herself and not by her attorney-in-fact. The same may be said of the oil and gas lease made in favor of Brown. The fact that plaintiff signed for herself in the partition deed more logically suggests that the power of attorney must have been given for some purpose other than that now claimed by plaintiff.

There is evidence to show that Brown talked to a real estate agent named M. B. Winsett about selling some "royalty," as it was sometimes referred to by the witnesses, and told Winsett that he desired to sell at a base price of $100 per acre, net to plaintiff. Winsett offered to sell a half interest in the

minerals in the 82 acres to Nabors and Deaton for the total price of $4,500, expecting to retain as his commission or profit the difference between the $4,100 at which Brown was willing to sell and the price of $4,500 quoted to the purchasers. Nabors and Deaton agreed to buy at the quoted price, and instructed their attorney Muse to examine the title. The abstracts revealed a deed of trust lien against the 82 acres, and Muse required that the lien be released before the deal should be closed. The purchasers delivered to Muse a check for $4,494.50, payable to the First National Bank of Bowie, to be used in paying for the mineral interests so purchased. This check was delivered to Winsett, who took it to the Bowie bank, and there met Brown. It is not entirely clear from the record why the check was made payable to the Bowie Bank, but seemingly it was agreeable to the purchasers, to Brown and to Winsett that the check be payable to the bank, and was contemplated by the parties that distribution of the purchase money should be made through the bank. Deaton, who prepared the check, deducted from the agreed purchase price the sum of $5.50 for revenue stamps, and wrote the check in the amount shown above. As stated, Winsett met Brown at the bank. Winsett, Brown and an official of the bank accomplished a distribution of the money. All over $4,100 was paid to Winsett. From the $4,100 the sum of $5.50 was deducted to pay for revenue stamps. Deaton had already deducted this amount, but no issue has been raised on appeal concerning this small item. Thirteen dollars and ten cents was deducted to cover the cost of a supplemental abstract, and $2 was deducted to cover the cost of preparing the mineral deeds. Four hundred and fifty-six dollars was deducted to pay off the note against the land. Presumably the amounts deducted were paid to the persons entitled thereto. Thus there remained from the $4,100 the sum of $3,623.40, which was deposited in the Bowie bank in the name of "Audrey Brown Reese, R. L. Brown, Jr., Atty. in Fact." While still at the bank, Winsett paid to Brown the sum of $100 from the money which Winsett had received from the transaction. More will be said later concerning the money which was deposited in the bank.

Plaintiff contends that the sale should be set aside because the purchasers, through Winsett as their agent, paid the sum of $100 to R. L. Brown, Jr. They rely on the rule that a sale may be invalidated by the principal if the purchaser pays a secret commission to the agent. The jury found that the purchasers did not know at the time they purchased the mineral interests that Brown was receiving the $100, that they could not have known such fact by the exercise of ordinary care and diligence, and that Winsett was not acting as the duly authorized agent of the purchasers in negotiating the purchase of the minerals from Brown. They also found that the purchasers, or their attorney Muse, delivered the check to Winsett, and that they authorized him to direct the distribution of the funds represented by the check in any way necessary to procure the mineral deeds. The trial court, on motion of the purchasers, disregarded the two findings of the jury last mentioned, as well as several others later to be mentioned, in rendering judgment. Plaintiff contends that the first three of the findings just mentioned should have been disregarded. Plaintiff also moved for judgment non obstante veredicto, on the ground that the three findings first mentioned, and certain others, should be disregarded.

 The rule that a sale made by an agent may be set aside by the principal where the purchaser has paid the agent a secret commission is obviously one of public policy, and the reason for it is plain. But the facts of this case do not bring it within the rule. It is undisputed that Brown engaged Winsett to undertake to sell some interest in the minerals, and that he told Winsett that he wanted to sell at a price of $100 per acre net to the owner. The only reasonable inference from the evidence is that, after the sale was made and the purchase money was ready to be distributed, both Brown and Winsett considered that Winsett should have for his commission all of the purchase price over $4,100. It cannot be disputed that Winsett paid the $100 to Brown from the so-called commission

which Winsett received. There is not a hint in the record that the purchasers knew or had any reason to know that Winsett and Brown had agreed that Brown should receive $100 of Winsett's commission. At any rate, the jury found that they did not, and the evidence amply supports the finding. There may be evidence which indicates that the purchasers, or their attorneys, expected Winsett to take the check to the Bowie bank and see to it that the funds were properly distributed, but we can find no evidence to suggest that they authorized him to direct the distribution of the funds in any way necessary to procure the mineral deeds, in the sense that he should be authorized even to pay a part of the purchase money to the attorney-in-fact by way of a secret commission for making the sale.

It has been stated that there was a deed of trust lien on the land, which the purchasers' attorney required to be released before closing the sale. The recitals of the deed of trust showed that it was given to secure a note signed by both the plaintiff and R. L. Brown, Jr. Four hundred and fifty-six dollars of the purchase money was used to obtain a release of this lien. Plaintiff argues that the sale should be set aside under the rule which precludes the agent from disposing of his principal's property upon consideration which in whole or in part inures to the benefit of the agent. For statements of the rule see Clark & Boice Lumber Co. v. Duncan, Tex.Civ.App., 143 S.W. 644, and cases there cited. Plaintiff argues that the purchasers had notice from the record of title that payment of the note in question would inure to the benefit of the agent Brown, and that they closed the sale knowing that a part of the purchase money was being used to pay an indebtedness for which Brown was liable. No issue was submitted nor requested, inquiring whether plaintiff or Brown, as between themselves, was obligated to pay the note, but the jury was asked, and answered in the affirmative, that plaintiff was obligated on the note. Plaintiff moved, in requesting judgment non obstante, that this finding be disregarded. We do not believe that the rule in question governs a case like the one before us. Here the purchasers' attorney required that a lien against the property be released before closing the deal. In the absence of a showing to the contrary, the logical inference would be that plaintiff must have received some benefit to herself when she executed the deed of trust against her property, and a logical inference also would be that she benefited from its release. When the mineral interest was offered for sale to the purchasers, nothing was said to the effect that a part of the purchase price should go to pay off an indebtedness of the agent. By virtue of a reasonable title requirement of the purchasers' attorney, a note which was signed by both principal and agent and which was secured by a lien on the principal's property, was paid off, and the agent may have benefited thereby, depending largely on whether he or his principal, as between themselves, was obligated to pay it. It is not reasonable to presume that plaintiff intended to authorize Brown to sell her property for the purpose of paying Brown's debts, but it is reasonable to presume that she would expect, in event of a sale of the property or an interest therein, that the lien against the land would have to be released before the purchaser would close the deal, and, in the absence of some other arrangement between herself and her brother, she might reasonably expect that some of the purchase money would be used for that purpose if money to pay the note were not otherwise provided. We find no element of fraud in this respect, nor do we believe that it ought to be presumed that plaintiff did not intend that her agent should have authority to do what might reasonably be necessary to deliver a clear title to the purchaser, even though payment of the note and release of the lien should incidentally result in a benefit to the agent.

We find no error in the judgment of the trial court denying plaintiff a cancellation of the mineral deeds. This brings us to a consideration of plaintiff's alternative claim against the First National Bank of Bowie.

As has been said, the check given to pay for the mineral interests was payable to the First National Bank of Bowie. It is not clear from the record why the check was made payable to the bank, but it is a reasonable inference that the purchasers intended that the bank should have some part in the distribution of the purchase money. It is

also clear that the bank, through one of its officials, participated in the application of $456 of the proceeds of the check to the payment of the note which is discussed above. On the same day the money was deposited, Brown, by check drawn against the account, paid to the bank the sum of $170.14 in payment of a note he owed to the bank, and on the same day, he drew a check for $3,400 payable to a bank in Nocona. The Bowie bank paid this check four days later. Plaintiff testified, and there is nothing in the record to the contrary, that she received none of the $3,400. The trial court instructed a verdict in favor of the bank. Plaintiff asserts in her brief that the trial court should have rendered judgment, and that we should render judgment here, against the bank for the amount paid on the note signed by plaintiff and Brown, to-wit, $456, for the $170.14 paid by Brown to the bank in payment of his personal note to the bank, and for the $3,400 which Brown withdrew.

■ First, it is argued that the bank knowingly participated in the application of $456 of the purchase money to the payment of a note which was an obligation of the agent. It is to be remembered that the suit against the bank is an alternative claim, asserted only in the event of failure of plaintiff to recover in her suit for cancellation of the mineral deeds. We thus get to the question of a claim against the bank only after we have upheld the sale of minerals made by plaintiff's agent. We have held that Brown had authority to apply $456 of the purchase money to the payment of the obligation which was secured by a lien against the land, a release of which had to be obtained in order to close the sale. We can see no basis for imposing liability on the bank for participating in the transaction in this respect. The bank had no interest in this note. From the viewpoint of the bank at the time the sale was closed, the act of the agent in paying the note in order to close the sale was on behalf of the principal, and was not primarily an act done to obtain a benefit for the agent at the expense of the principal.

■ Under the undisputed evidence plaintiff was entitled to judgment against the bank for the $170.14 which Brown paid to it, from plaintiff's funds, in payment of his personal indebtedness to the bank. The opinion in United States Fidelity & Guaranty Co. v. Adoue & Lobit, 104 Tex. 379, 137 S.W. 648, 138 S.W. 383, is authority both for the proposition that the bank here was charged with notice that the money constituted trust funds, and for the proposition that it became liable for its participation in the conversion of the sum which Brown paid to it on his personal indebtedness. To the same effect see Wichita Royalty Co. v. City Nat. Bank of Wichita Falls, 127 Tex. 158, 89 S.W.2d 394, rehearing denied 127 Tex. 158, 93 S.W.2d 143, and the numerous cases there cited.

A more difficult question is whether the bank is liable for the $3,400 which Brown withdrew from the account. Plaintiff relies on two cases, Wichita Royalty Co. v. City Nat. Bank of Wichita Falls, supra, and the oft-cited case of Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A. 1916F, 1059, which is cited in the Wichita Royalty case. Plaintiff's theory is that the bank acquired knowledge, by reason of the payment of the $456 note, above mentioned, and the payment of the $170.14 note, that Brown was diverting the trust funds to his own uses, and that the bank then became liable for failure to restrict the use of the trust funds to lawful or trust purposes, or to notify the cestui or the principal that the funds were being mis-used.

It would serve no useful purpose here to write at length on the liability of a bank with respect to withdrawals of what it knows to be trust funds. The rules are discussed at great length in the Wichita Royalty case, supra, and in the other cases there cited. It cannot be doubted that the court declared in the Wichita Royalty case that the bank there was liable, under the facts of that case for the wrongful withdrawals of funds by the trustee after the bank had been paid some of the trust funds in payment of personal debts of the trustee to the bank. To the same effect was the holding in Bischoff v. Yorkville Bank, supra. But in both of those cases, as well as in a great many others which we have considered, there were two differences in regard to the facts from the case before us, which we believe to be of controlling importance. In the first .

place, as is pointed out in the opinions, in both of those cases there was not merely a single, isolated, misuse of funds which came to the attention of the bank. Also, there was the additional fact that the trustee, in making away with trust funds, first transferred large amounts of the trust funds from the trust account to the trustee's personal bank account. The courts declare that the mere deposit of known trust funds in the personal bank account of the trustee does not of itself render the bank liable for conversion of the funds by the trustee, because the bank may properly assume that he will faithfully execute the trust, even though he carries the funds in his personal account. The courts do recognize, however, that the practice of carrying trust funds in the trustee's personal account is one which may arouse suspicion, and it is against such a background that the courts in the two cases cited, as well as in many others (see annotation in 145 A.L.R. 445), have declared that a bank may become liable for conversion by the trustee of trust funds deposited in his personal account after the bank has acquired knowledge, through application of some of the trust funds to payment of personal debts of the trustee to the bank, that the trustee has become unfaithful to his trust. In none of the cases which have come to our attention has a bank been held liable for all subsequent defalcation of trust funds, after payment of a personal debt of the trustee with trust funds, where the trust funds were carried in a trust account, labeled as such, rather than in the personal account of the trustee. We observe that in the Wichita Royalty case no effort was made to impose liability on the bank for conversion of funds carried in the trust account, but only for conversion of funds transferred from the trust account to the personal account of the trustee, and later misappropriated. We would not say that a bank could not, under any circumstances, be held liable for conversion by the trustee of funds from the trust account, as distinguished from his personal account, but we do believe that a bank should be held to a stricter rule where it knows that trust funds are being carried in the personal account of the trustee. Depositing the trust funds in the personal account is itself a circumstance calculated to arouse suspicion, though not enough by itself to charge the bank with the duty of seeing to it that a proper application is made by the trustee of such funds. In the case before us we have, in the payment of the $170.14 note, only an isolated transaction, involving a small amount of money. It was not such a transaction as would necessarily be handled by officers of the bank, but more likely by some minor employee. The only proof is that the note was paid, and that Brown alone was the debtor. He testified that no one at the bank asked him to pay it. It is not shown that any officer of the bank had personal knowledge of the transaction, and we do not consider that the circumstances were such that we should hold that the officers of the bank ought to have known that a small debt had been paid to the bank from trust funds. Whether or not the bank knew that trust funds had been used to pay the note, it should return plaintiff's $170.14 to her, because, as said in some of the cases cited, the bank received it without consideration, and plaintiff has the better equity in such money. But it was not such a circumstance as, without more proof than we have here, ought to charge the bank with notice that Brown would convert the remainder of the money on deposit in the trust account. Even if we should hold that the circumstance was enough to put the bank on inquiry, the proof before us is sufficient to show only that the bank would have learned that Brown had drawn a check for $3,400 payable to another bank. He had unquestioned authority to handle the money as attorney in fact for his sister, and the bank on inquiry would only have learned, so far as the proof before us would indicate, that Brown was transferring the money to another bank.

We can find no precedent in the decisions for holding the bank liable for the $3,400.

Under her thirteenth point of error plaintiff contends that she should have had judgment against Brown for the $100 which Brown received from Winsett, and the $456 which was paid on the Williams

note. Plaintiff recovered judgment against. Brown for the $170.14 which was paid to the bank, and for the $3,400.

■ Plaintiff was entitled to judgment for the $100 which Brown received from Winsett. "An agent may not for his own benefit make and retain a secret profit when acting in behalf of his principal; he must account to his principal therefor." 2 Tex. Jur., p. 598.

■ As for the $456, we have pointed out that no issue was submitted nor requested inquiring whether plaintiff or Brown, as between themselves, should have paid the $456. The most that can be said of the evidence is that a jury issue was raised. Under Rule 279, cited supra, we must treat the ground of recovery as waived.

Other questions are raised in the briefs of the parties, but what we have said compels what we believe to be the proper disposition to be made of the appeal.

The judgment of the trial court is reformed in the following respects: Plaintiff shall have judgment against Brown and the First National Bank of Bowie, jointly and severally, for the sum of $170.14; and plaintiff shall have judgment against Brown for the sum of $3,500. The Bank has no pleading seeking any relief by way of cross-action, or plea over, against Brown. In all other respects the judgment of the trial court is affirmed, except as to costs.

The defendants R. L. Brown, Jr., and the First National Bank of Bowie, jointly and severally, shall pay one-fifth of the costs incurred in the trial court; the defendant R. L. Brown, Jr., shall pay all the remaining costs in the trial court; and the plaintiff Audrey Brown Dockstader shall pay four-fifths, and the defendant, The First National Bank of Bowie, shall pay one-fifth, of the costs of appeal.

Judgment of the trial court reformed, and as reformed, affirmed.