No. 66,420

Bank IV, Olathe, Administrator C.T.A. of the Estate of Tillie A. Flinn, Deceased, *Appellant*, v. Capitol Federal Savings & Loan Association, *et al., Appellees.*

(828 P.2d 355)

Opinion filed March 20, 1992.

*Keith Martin,* of Payne & Jones, Chartered, of Overland Park, argued the cause, and *Erich W. Wurster,* of the same firm, was with him on the brief for appellant.

*John Anderson, Jr.,* of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

McFarland, J.: This is an action by the estate of a decedent to recover funds paid to an individual operating under a power of attorney executed by the decedent. The district court entered summary judgment in favor of one of the two defendant savings and loan institutions, and the estate appeals therefrom.

The facts may be summarized as follows. On June 15, 1987, Tillie A. Flinn executed a durable power of attorney designating her nephew James C. Flanders and/or Martha E. Flanders (James' wife) as her attorneys in fact. Tillie's signature on the power of attorney was duly notarized and the estate admits the signature is Tillie's. In January 1988 Tillie owned 12 certificates of deposit issued by defendant Capitol Federal Savings and Loan Association. The value of said CD's was approximately $194,000. Some of the CD's dated back to 1973.

On January 13, 1988, at approximately 10:00 a.m., Martha Flanders went to a Capitol Federal office. She had: (1) the durable power of attorney instrument; (2) five certificates of deposit; and (3) a hand-printed letter identifying Martha as an attorney in fact and stating that Tillie wished to cash the five CD's (identified by number) that Martha had with her. At approximately 10:31 a.m., five checks were given to Martha in the aggregate amount of $135,791.34, representing the funds in said CD's less penalties for early withdrawal in the aggregate amount of $4,757.70. Some of the checks were drawn in Martha's name, individually, and some in the names of James and Martha, also as individuals. Nothing on the checks indicated that they were being issued to said individual or individuals in her or their representative capacities. Uncashed CD's in the aggregate amount of $58,127.58 then remained at Capitol Federal. Tillie was found dead of heart disease later that day. The time of death on her death certificate is set at 11:30 a.m.

Bank IV, as administrator C.T.A. of Tillie's estate, filed two lawsuits in 1990: (1) the action herein against Capitol Federal and Argentine Savings and Loan Association seeking the return of Tillie's funds paid out to the Flanders; and (2) an action against Martha and James Flanders seeking return of said funds. The two actions were consolidated for discovery purposes only. The estate's action against Argentine was settled and dismissed. The district court entered summary judgment in favor of Capitol Federal and the estate appeals therefrom.

It is apparently undisputed that the Flanders spent all sums received by them from Capitol Federal for their personal usage, and that the funds cannot be traced and recovered. Other facts will be stated as necessary for the discussion of particular issues.

The estate contends that the district court erred in granting summary judgment to Capitol Federal. Specifically, the estate contends:

1. Capitol Federal breached a duty to investigate before issuing the checks;
2. the terms of the durable power of attorney instrument were not broad enough to authorize the issuance of checks in the name or names of the attorney(s) in fact as individual(s); and
3. a procedural error by Capitol Federal entitled the estate to summary judgment in its favor.

## DUTY TO INVESTIGATE

The estate contends that the size of the transaction involved herein and the forfeiture of interest thereon, coupled with the fact the checks were requested to be issued in the individual name(s) of the attorney(s) in fact were sufficiently suspicious circumstances to create a duty in Capitol Federal to investigate / before releasing the funds. Specifically, the estate contends that Capitol Federal should have: (1) determined whether or not Tillie's "true wishes" were being carried out; and (2) checked to see whether Tillie was still alive. Capitol Federal argues that its duty only requires a favorable comparison of the signatures of the depositor with that on the power of attorney, proper identification of the attorney in fact, and a determination that the transaction is within the scope of the power of attorney. Capitol Federal further contends any requirement for additional investigation would be unduly burdensome on lending institutions.

The first aspect of this issue concerns Tillie's competency. It is unclear whether the estate is contending that Capitol Federal should have made inquiry into Tillie's competency as of the time of the execution of the power of attorney or as of the time of the request for the transfer of funds, or both.

As far as the question relates to competency at the time of the transfer of funds is concerned, the matter is resolved by statute. Kansas has adopted the Uniform Durable Power of Attorney Act (K.S.A. 58-610 *et seq.*). Included therein is K.S.A. 58-611, which provides:

"All acts done by an attorney in fact pursuant to a durable power of attorney during any period of disability or incapacity of the principal have

the same effect and inure to the benefit of and bind the principal and the principal's successors in interest as if the principal were competent and not disabled."

Additionally, the instrument itself expressly provides: "This power of attorney is durable and shall not be affected by the subsequent disability or incompetence of the principal."

Thus, incapacity of Tillie at the time of the withdrawal of funds is not a factor in the determination by the lending institution on whether or not to honor the request by an attorney in fact for withdrawal of funds. If it were otherwise, the very purpose of many powers of attorney, which is to allow the orderly transaction of a person's business during contemplated disability or incompetency without expensive and time-consuming probate proceedings, would be defeated.

Did Capitol Federal have a duty, under the facts herein, to investigate into the capacity of Tillie at the time of the execution of the instrument in determining whether or not to honor the request for the withdrawal of funds? We believe not. The circumstances involved herein demonstrate the impracticality of imposing such a requirement. It is 10:00 a.m. on January 13, 1988. The attorney in fact is standing on one side of the counter seeking withdrawal of funds under a power of attorney executed on June 15, 1987. The test for capacity to execute a power of attorney would presumably be comparable to that for capacity to execute a will. An individual who is incompetent most of the time may have lucid intervals in which he or she has the capacity to contract or make a will. Determination of a person's capacity to contract or make a will involves determination of capacity at the particular point in time the instrument was executed. Frequently, there is conflicting testimony among lay persons and health care professionals and the judicial hearings thereon are lengthy and involved. As a practical matter, how could the Capitol Federal employee, responding to the attorney in fact's request for withdrawal of funds, make such a determination? Capitol Federal notes in its brief that every working day it has over 500 transactions involving an agency or power of attorney relationship. The practical effect of requiring such a determination would, again, be to eliminate the power of attorney as a useful tool in the transaction of the

business of any elderly, disabled, absent, or otherwise incapacitated individual.

As noted by the district court in its memorandum decision:

"The duty of Capitol Federal to Tillie Flinn, its depositor, focuses on an issue which has drastic and far reaching implications. The final decision of our Appellate Courts will impact upon the management of the assets of our elderly, disabled and also upon the management of our financial institutions. The Durable Power of Attorney provides an inexpensive vehicle for family members to manage the finances of the impaired relative without incurring the substantial expenses of creating a conservatorship. The start-up for a conservatorship is in the range of $10,000.00. Annual accounting fees are much less than the start up costs, but are incurred annually.

"The Power of Attorney eliminates the necessity of opening and maintaining a conservatorship. In order to function the powers of the Attorney-in-Fact must be recognized by financial institutions.

"The public support for the Durable Power of Attorney is manifested by the Legislature's passage of the Uniform Durable Power of Attorney Act. (K.S.A. 58-610 *et seq.*)"

The estate cites no authority in support of the proposition that a lending institution has a duty to determine the capacity of the grantor at the time of the execution of a power of attorney before honoring a request for a transfer of funds thereunder. We conclude that no such duty exists and that the district court correctly determined that Capitol Federal had no such duty to investigate. It should be noted, perhaps, that there is no claim made that Capitol Federal had actual knowledge of any incapacity or incompetency on the part of Tillie nor had she been adjudicated a disabled or incapacitated person.

This brings us to the claim that Capitol Federal should have ascertained whether or not Tillie was alive when the request for transfer was made.

K.S.A. 58-613 provides:

"(a) The death of a principal who has executed a written power of attorney, durable or otherwise, does not revoke or terminate the agency as to the attorney in fact or other person, who, without actual knowledge of the death of the principal, acts in good faith, under the power. Any action so taken, unless otherwise invalid or unenforceable, binds the principal's successors in interest."

Here again, the estate cites no authority for the proposition Capitol Federal was under some duty to determine that Tillie was alive before transferring the funds. There is no claim made

that Capitol Federal had actual knowledge that Tillie was deceased when the transfer was requested. In fact, based upon the death certificate's stated time of death, Tillie was alive when the transfer was made. We find no merit in this point.

Next we shall consider the catchall claim that Capitol Federal should have determined the transfer of funds by checks to the attorney(s) in fact was carrying out Tillie's "true wishes." Presumably, this would entail some type of face-to-face meeting between a representative of Capitol Federal and Tillie to determine if she knew of and approved of the requested transfer and the form of the checks. A telephone call would be insufficient as the Capitol Federal employee would have no way of knowing if the person responding to the call was really Tillie. Inherent in this procedure would be the requirement that the Capitol Federal employee know Tillie or had secured sufficient identification to be positive that the person with whom he or she was conferring was, in fact, Tillie. For reasons already expressed, a duty to determine the "true wishes" of the principal is unrealistic and would result in the loss of powers of attorney as useful tools in the transaction of the business of disabled, elderly, and/or absent principals.

We conclude that when confronted with the request for withdrawal of funds herein, Capitol Federal had a duty to:

1. compare the signature on the power of attorney with Tillie's signature on file as a depositor as to the authenticity thereof;
2. obtain proper identification of the person seeking withdrawal as the person designated attorney in fact;
3. determine whether or not the requested transaction was within the scope of the durable power of attorney presented.

It is uncontroverted that Capitol Federal did compare the signatures, and it is admitted Tillie executed the power of attorney. This requirement then, has been satisfied. There is no claim that the Martha Flanders with whom Capitol Federal dealt was an imposter and not the individual designated as attorney in fact or that Capitol Federal breached a duty relative to her identification. This leaves only the question of whether the transaction was within the scope of the durable power of attorney, and that is the subject of the next issue.

The district court's memorandum decision essentially placed the same three requirements on Capitol Federal and we find no error therein.

## SCOPE OF DURABLE POWER OF ATTORNEY

The estate contends that the scope of the durable power of attorney herein was not broad enough to authorize Capitol Federal to issue the checks in the name(s) of the attorney(s) in fact as individuals.

The powers granted are as follows:

"(A) Power with Respect to Bank Accounts. To establish accounts of all kinds for me with financial institutions of any kind; to modify, terminate, make deposits to and write checks on and endorse checks for or make withdrawals from all accounts in my name or with respect to which I am an authorized signatory; to negotiate, endorse or transfer any checks or other instruments with respect to any such accounts; and to contract for any services rendered by any financial institution.

"(B) Power with Respect to Safe-Deposit Boxes. To contract with any Institution for the maintenance of a safe-deposit box in my name; to have access to all safe-deposit boxes in my name or with respect to which I am an authorized signatory; to add to and remove from the contents of any such safe-deposit box and to terminate any and all contracts for such boxes.

"(C) Power to Sell and Buy. To sell and buy personal, intangible or mixed property, upon such terms and conditions as may seem appropriate to use any credit card held in my name to make such purchases and to sign such charge slips as may be necessary to use such credit cards; and to repay from any funds belonging to me any money borrowed and to pay for any purchases made or cash advanced using credit cards issued to me.

"(D) Power to Exercise Rights in Securities. To exercise all rights with respect to securities that I now own, or may hereafter acquire; and to establish, utilize and terminate brokerage accounts.

"(E) Power to Borrow Money (including any Insurance Policy Loans). To borrow money for my account upon such terms and conditions as may seem appropriate and to secure such borrowing by the granting of security interests in any property or interest in property which I may now or hereafter own; to borrow money upon any life insurance policies owned by me upon my life for any purpose and to grant a security interest in such policy to secure any such loans; and no insurance company shall be under any obligation whatsoever to determine the need for such loan or the application of the proceeds therefrom.

"(F) Power with Respect to Taxes. To prepare, sign and file Federal, state and/or local income, gift, property or other tax returns, claims, etc.

"(G) Power to Demand and Receive. To demand, arbitrate, settle, sue for, collect, receive, deposit, expand for my benefit, reinvest or make such other appropriate dispositions of, as my Agent deems appropriate, all cash

rights to payments of cash, property (personal, intangible and/or mixed), rights and/or benefits to which I now or may in the future become entitled, regardless of the identity of the individual or public or private entity involved (and for purposes of receiving Social Security benefits, my Agent is herewith appointed my 'Representative Payee'); to utilize all lawful means and methods for such purposes.

"I further give and grant to my said Attorney(s)-in-Fact full power and authority to do and perform every act necessary to be done in the exercise of any of the foregoing powers as fully as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said Attorney(s)-in-Fact shall lawfully do, or cause to be done by virtue hereof.

"This instrument may not be changed orally.

"This power of attorney is durable and shall not be affected by the subsequent disability or incompetence of the principal.

"TO INDUCE ANY THIRD PARTY TO ACT HEREUNDER, I HEREBY AGREE THAT ANY THIRD PARTY RECEIVING A DULY EXECUTED COPY OR FACSIMILE OF THIS INSTRUMENT MAY ACT HEREUNDER, AND THAT REVOCATION OR TERMINATION HEREOF SHALL BE INEFFECTIVE AS TO SUCH THIRD PARTY UNLESS AND UNTIL ACTUAL NOTICE OR KNOWLEDGE OF SUCH REVOCATION OR TERMINATION SHALL HAVE BEEN RECEIVED BY SUCH THIRD PARTY AND I FOR MYSELF AND FOR MY HEIRS, EXECUTORS, LEGAL REPRESENTATIVES AND ASSIGNS, HEREBY AGREE TO INDEMNIFY AND HOLD HARMLESS ANY SUCH THIRD PARTY FROM AND AGAINST ANY AND ALL CLAIMS THAT MAY ARISE AGAINST SUCH THIRD PARTY BY REASON OF SUCH THIRD PARTY HAVING RELIED ON THE PROVISIONS OF THIS INSTRUMENT."

In holding that the powers granted in the instrument were broad enough to authorize Capitol Federal to issue checks in the name or names of the attorney(s) in fact only, the district court reasoned as follows:

"This is a question of law that is to be decided within the four corners of the written Power of Attorney. The estate contends the document does not authorize the bank to pay Tillie Flinn's funds to Martha Flanders personally. The Court has reviewed the entirety of the Durable Power of Attorney involved in this case and finds the document is not ambiguous with respect to any issue in this case and therefore extrinsic evidence is not necessary to determine the legal effect of the document. The relevant portions of the document are: [Here the district court set forth paragraph (A) and the paragraph immediately following paragraph (G).].

"The language of this Power of Attorney literally gives to the agent all the powers which the principal has with respect to bank accounts. The document does not place restrictions upon the Attorney-in-Fact nor does it place any limitations upon Capitol Federal. Tillie Flinn, personally, could

have requested Capitol Federal to pay the deposited funds to the order of Martha Flanders. If Tillie Flinn could have accomplished this then her Attorney-in-Fact has the same authority. The claim by the estate that the Power of Attorney did not authorize the withdrawal and transaction is not well taken.

"The above construction of the Power of Attorney distinguishes the attorney in fact from the agent referred to in *Henderson v. Hassur*, 225 Kan. 678. The Attorney-in-Fact does owe a fiduciary duty to the principal. This duty does not impose upon third parties a duty beyond restrictions created in the power of attorney."

The form for the instrument at issue was cut from a magazine and not specifically drafted for the use of Tillie. This fact has no bearing on the issues before us but is mentioned only to note that there is no drafter of the instrument who has knowledge of the particular circumstances surrounding its creation and execution.

The estate argues that strict construction of the power of attorney is required and that under such construction there is no authority therein for an attorney in fact to have checks representing the principal's funds issued in the agent's individual name.

We do not agree with this conclusion.

3 Am. Jur. 2d, Agency § 30, pp. 533-35, states:

"Powers of attorney are to be construed in accordance with the rules for the interpretation of written instruments generally, in accordance with the principles governing the law of agency, and, in the absence of proof to the contrary, in accordance with the prevailing laws relating to the act authorized.

"As in the case of other written instruments, there is no room for construction of a power of attorney which is not ambiguous or uncertain, and whose meaning and portent are perfectly plain. But in cases where construction of the instrument or the interpretation of its language is necessary— that is, where the meaning of the instrument or the operative langauge therein is uncertain, obscure, or ambiguous—the first and foremost rule is that the intention of the parties as it existed at the time the power was granted is to be given effect. Also, the whole of the writing is to be taken together so as to give effect to every part, and each clause should be used to interpret the others. Furthermore, the words in the instrument should be taken in their ordinary and popular sense, rather than according to their strict legal meaning, unless the parties used them in a technical sense or unless a special meaning is given to them by usage, in which case the latter must be followed. Where technical words are used, they should be interpreted as usually understood by persons in the profession or business to which they relate, unless they are clearly used in a different sense."

3 Am. Jur. 2d, Agency § 31 states that, as a general rule, powers of attorney are to be strictly construed.

But 3 Am. Jur. 2d, Agency § 33, pp. 536-37, states:

"The rule of strict construction of a power of attorney is not absolute and should not be applied to the extent of destroying the very purpose of the power. The rule does not call for a strained interpretation, and if the language will permit, a construction should be adopted which will carry out, instead of defeat, the purpose of the appointment. Even if there are repugnant clauses in a power of attorney, they should be reconciled, if possible, so as to give an effect to the instrument in keeping with its general intent or predominant purpose. Furthermore, the instrument should always be deemed to grant such powers as are essential or usual in effectuating the expressed powers."

Extremely broad powers are granted by the instrument to the attorney(s) in fact. In essence, the instrument is saying to third parties that the attorney(s) in fact are authorized to act in Tillie's place and stead relative to all of her assets and business. Tillie could, obviously, have gone to Capitol Federal, cashed the CD's (with penalties), and had the checks drawn in the individual names of the Flanders. We see nothing in the instrument which operates to limit the powers of the attorney(s) in fact to the withdrawal of funds only if Tillie's name appears on the checks or the agency relationship is otherwise disclosed. Even had the checks been drawn with the agency relationship set forth thereon, the misappropriation of the funds by the agents would not have been avoided. The Flanders had only to deposit the checks and then write checks to themselves.

There are cases which hold a banking institution liable for an agent's misappropriation of a principal's funds, but some additional factor is present in those cases which, in effect, put the bank on notice of the agent's wrongful usage of the funds and made the bank an accessory therein. For example, see *First Nat. Bank v. Cooper*, 252 Ga. 215, 312 S.E.2d 607 (1984). A son, holding a power of attorney from his father, assigned one of the father's CD's as collateral to secure a personal loan for himself. In affirming the lower court's judgment against the bank, the Georgia Supreme Court stated:

"The portions of the power of attorney relied on by the appellant bank, quoted hereinabove, must be read in the context of the entire power of

attorney, which is to be construed strictly and in light of the four corners of the document. [Citation omitted.] The clear and unambiguous purpose of the power of attorney here is to serve and benefit only the grantor of the power, Carlos Cooper. Although the powers granted to the defendant agent were broad in banking matters on behalf of the deceased, there was no authorization for the agent to use such powers on his own behalf, *i.e.*, to secure a personal loan for himself. The defendant bank was on notice as to the extent of the power of attorney, hence was not authorized to allow the assignment of any C/D of the grantor in furtherance of the agent's personal goal of obtaining a loan for himself." 252 Ga. at 216.

This same thread runs through *Wickens v. Valley State Bank*, 125 Kan. 751, 266 Pac. 81 (1928). A retired farmer set up a trust with a bank officer as trustee. The bank was not a party thereto. The trustee had broad discretionary powers to invest the trust fund. Unfortunately, the trustee pocketed a substantial portion of the trust. In holding the bank was not liable for the trustee's misappropriation of funds, the court stated:

"The selection of an agent or trustee is an individual matter, lying within the power of him who makes the selection. He may change his selection and may require such bond or security as he desires. Having sole power of appointment, he has no right to claim that any third person shall be liable for the default of his agent, selected solely by him, unless the third party has participated in the misappropriations to the extent of becoming a party to the fraud. The defendant bank in the instant case had no right to supervise the investment of the funds or the value of the securities taken, nor had it the right to refuse payment of the check or order of [the trustee]." 125 Kan. at 759.

In 5A Michie, Banks and Banking § 72 (1983), it is stated:

"A principal may expressly authorize a bank to accept or pay checks drawn by an agent or fiduciary to his own order. It is generally held that where an agent draws checks on his principal's account, payable to himself, and deposits them to his own account, the mere form of the transaction, in the absence of additional circumstances, is not sufficient to put [the] depositing bank on notice of the agent's fraud."

Michie states the rule is the same for trustees who withdraw money from a trust account and use it for their own purposes:

"A bank is liable when it has actual or constructive knowledge that a fraud is being or is about to be perpetrated by the fiduciary, and assists him in making a misappropriation of the trust funds. It is held that to render the bank liable it must have actually participated in the misappropriation, or with knowledge reaped some benefit therefrom . . . . A bank does not become a party to the diversion of an incompetent's funds merely because

money is withdrawn by checks made payable to the incompetent's committee." 5A Michie § 57e.

Michie's statement of the law is supported by case law. In *Empire Trust Co. v. Cahan*, 274 U.S. 473, 71 L. Ed. 1158, 47 S. Ct. 661 (1927), a father had given his son power of attorney to draw checks for him at two banks. The powers of attorney had no pertinent restrictions in them. For two years the son drew checks against his father's account, signing his father's name by himself as attorney in fact. A number of these checks were made payable to the son's order, and the son deposited them in his own accounts and eventually spent the money. The father sued one of the banks in which he had an account.

The trial court and the U.S. Second Circuit Court of Appeals held that the bank had sufficient notice that the son was misappropriating money that the bank should be held liable. The United States Supreme Court reversed, stating:

"The [bank] had notice that the checks were drawn upon the [father's] account, but they were drawn in pursuance of an unlimited authority. We do not perceive on what ground the petitioner could be held bound to assume that checks thus lawfully drawn were required to be held or used for one purpose rather than another. . . . The notice to the bank was notice only of this [agency] relation of the parties. The [bank] in permitting the son to draw out the money was permitting only what it, like the [father's] banks, would have been bound to allow even if the deposit had been earmarked as a trust." 274 U.S. at 479.

In the end, the Court held that it would be impractical to put the burden on banks to check each agency transaction to make sure the agent is acting within his authority: " 'The transactions of banking in a great financial center are not to be clogged, or their pace slackened, by over-burdensome restrictions.' " 274 U.S. at 480 (quoting *Whiting v. Hudson Trust Co.*, 234 N.Y. 394, 406, 138 N.E. 33 [1923]).

In *Nashville Trust Co. v. Southern Buyers, Inc.*, 40 Tenn. App. 11, 288 S.W.2d 469 (1956), a corporation asserted a claim against a bank for allowing an agent of the corporation to draw checks on the corporation's account in his own name. The Tennessee Court of Appeals held that the bank was not liable because the corporation had given the bank a signature card with the agent's name on it, without any limitation. The court said,

"It is generally held that where an agent draws checks on his principal's bank account, payable to himself, and deposits them to his own account, the mere form of the transaction, in the absence of additional circumstances, is not sufficient to put the depositing bank on notice of the agent's fraud." 40 Tenn. App. at 17.

In *Dockstader v. Brown*, 204 S.W.2d 352 (Tex. Civ. App. 1947), a sister had given her brother a power of attorney which included the power, "in my name, place and stead, to do any and every act, and exercise any and every power that I might, or could do or exercise through any other person, and that he shall deem proper or advisable, intending hereby to vest in him a full and universal power of attorney . . . ." The brother, pursuant to this power of attorney, sold an oil and gas interest in land in which his sister held an interest. After the sale of the interest, the brother, using his power of attorney, withdrew most of the proceeds for his personal use.

The sister sued the brother, the purchasers, and a bank, claiming the bank participated in the conversion by her brother of the money from the sale. The appellate court ultimately held that the bank was not liable. The court said that a bank may be liable for such a conversion when the bank has notice of the wrongdoing. 204 S.W.2d at 358-59. The court distinguished certain other cases in which banks had been held liable, because in those cases there were facts putting the banks on notice, *i.e.*, repeated transactions, etc. The ultimate holding of this case is that a bank may be liable for conversion of funds by a trustee or attorney, but the facts must be such as to put a bank on notice of the conversion. 204 S.W.2d at 359.

In *Grace v. Corn Exchange Bank Trust Co.*, 287 N.Y. 94, 38 N.E.2d 449 (1941), a trustee, over a period of six years, managed to waste and appropriate almost $450,000 from a trust account. He wrote 146 checks on the trust account and deposited them in his own account. The money was spent on the trustee's personal business. The court stated:

"[I]f a bank connives with a trustee and knowingly assists the trustee to embezzle funds he holds as fiduciary, the bank is liable for the moneys embezzled just as any other person, who knowingly assists a wrongdoer, would be liable as a joint wrongdoer for a wrong so committed." 287 N.Y. at 100-101.

The court explained the bank's duties as follows:

"In considering the effect of this evidence we must constantly bear in mind that the bank was under no duty to exercise vigilance to protect the trust estate from possible embezzlement by the trustee. When it accepted the trust account in which the trust funds were deposited, it assumed the obligation to pay out the moneys deposited in accordance with the directions of the trustee. It assumed no other obligation. To establish joint liability of the bank for the derelictions of the trustee, the plaintiffs must prove that the bank gave to the wrongdoer such assistance as would make the bank a participant in the wrong." 287 N.Y. at 102.

The court went on to discuss the fact that although the bank was aware that the trustee was shifting money to his personal account, the bank was not liable unless it appeared that the bank "knew that the trustee was engaged in embezzling trust funds by withdrawal of the trust money in the personal account *in order to apply them to his own use* . . . ." 287 N.Y. at 102. The court said that when a trustee withdraws funds in his own name, there is a presumption that he is applying them to a legitimate and lawful use. 287 N.Y. at 102. The appellate court ultimately upheld the trial court's determination that the bank did have sufficient notice to constitute constructive knowledge and affirmed the judgment against the bank, largely because of the number of checks written.

In *Cassel v. Mercantile Trust Company*, 393 S.W.2d 433 (Mo. 1965), a trustee and executor withdrew money from the decedent's checking account by cashing a series of checks to himself totaling $108,225. He did not use the money for trust or estate purposes. The successor trustee sued Mercantile, alleging that because of the series of transactions, it had sufficient knowledge that the trustee was breaching his duties to hold the bank liable. The court said that there are three ways in which a bank could incur liability for deposits misappropriated by a fiduciary:

"(1) by a violation on its part of the contract, express or implied, between it and the owner of the fund;

"(2) by appropriating the fund, either with or without the fiduciary's consent, to the payment of the latter's debt to the bank; and

"(3) by assisting the fiduciary to accomplish the misappropriation, the bank having knowledge, actual or constructive, that the fraud is being or is about to be perpetrated by the fiduciary." 393 S.W.2d at 437.

The Missouri court went on to say that in order to state a claim for relief, the plaintiff must allege:

"(a) facts which show that the bank had knowledge of the trust character of the funds on deposit and that the fiduciary unlawfully withdrew and misappropriated trust funds;

"(b) facts sufficient to overcome the presumption in which the bank is entitled to indulge, namely that in withdrawing trust funds the fiduciary is acting lawfully and in the performance of his duties as a trustee, and that he will appropriate the money, when drawn, to a proper use;

"(c) facts which show, directly or by necessary inference, that the bank participated in the breach of trust in receiving or permitting the trustee to withdraw the trust funds, by receiving the deposit or permitting the withdrawal with notice of the breach of trust." 393 S.W.2d at 437.

The court held that under the facts and Missouri rules for pleading, the plaintiff had failed to state a cause of action and affirmed the trial court's dismissal.

In the case before us, Capitol Federal was presented with a power of attorney which it is agreed was signed by Tillie, its depositor. Martha Flanders was properly identified as being the Martha Flanders designated as attorney in fact. We conclude the request to cash the CD's and the issuance of checks in the individual name(s) of the attorney(s) in fact was within the scope of the power of attorney. Capitol Federal had the right to assume the attorney in fact was acting lawfully in the performance of her agency duties and to honor the agent's request that the checks be drawn in her own name and that of her husband, also an attorney in fact for Tillie. Capitol Federal had no knowledge the funds would be subsequently misappropriated by Flanders, nor did it participate in such misappropriation. Absent an act and acts amounting to participation in the wrongdoing, Capitol Federal's issuance of the checks in the name(s) of the attorney(s) in fact imposes no liability on Capitol Federal.

We find no error in the district court's entry of summary judgment in favor of Capitol Federal relative to this issue.

## PROCEDURAL ERROR

On January 10, 1991, Capitol Federal filed its motion for summary judgment with accompanying statement of uncontroverted facts and memorandum. On January 24, 1991, the estate filed its response thereto and a cross-motion seeking summary judgment

with an uncontroverted statement of facts attached. On January 31, 1991, a hearing was held on both motions for summary judgment. At the close of the hearing, the court indicated it had made up its mind on the motions and there was a discussion of whether a memorandum decision would need to be written. Counsel agreed a written decision was needed because there would be an appeal. There was some additional discussion at the end of the hearing concerning the fact that Capitol Federal had not filed a response to the estate's memorandum of uncontroverted facts. As will be recalled from the time frame involved herein, the estate's cross-motion for summary judgment was filed only five business days before the hearing on both motions. Supreme Court Rule 141 (1991 Kan. Ct. R. Annot. 117) grants an opposing party 21 days to respond thereto. Thus, the time had not expired for the filing of this response.

It is unclear whether Capitol Federal expressly waived the filing of a response, but certainly Capitol Federal did not contemplate filing a response. None was filed. The district court issued its memorandum decision on or about February 19, 1991, granting summary judgment to Capitol Federal.

On appeal, the estate contends Capitol Federal's failure to file a response to the estate's uncontroverted statement of facts admits all such alleged facts. It cites Rule 141, which provides that failure to respond is an admission of the uncontroverted facts.

Hearing the motion prior to the expiration of the time for response or the filing of a response is at variance with Rule 141. However, a careful review of the hearing transcript, both parties' statements of uncontroverted facts (including the estate's response), the district court's memorandum opinion, and the issues involved therein and in this appeal convinces us that no reversible error has been shown.

The judgment is affirmed.

ABBOTT, J., concurring and dissenting: I have no quarrel with the law or reasoning of the majority except as set forth in this dissent. I would point out that most of the authority cited by the majority deals with checks. Clearly, a bank could not function if, in check transactions, the bank was required to do more than the majority opinion requires.

My dissent is simple. In my opinion, the trial judge's grant of summary judgment was premature because I would adopt an additional requirement: If a transaction dependent upon a durable power of attorney is more than a routine transaction and if an officer of the bank is involved directly and has actual or constructive knowledge leading a reasonable person to suspect funds are about to be misappropriated, then the bank has a duty either to inquire into the circumstances before it pays out the money or to pay the funds out in such a manner that will protect the depositor. See *Hubbard v. Home Fed'l Savings & Loan Ass'n*, 10 Kan. App. 2d 547, 557, 704 P.2d 399 (1985); *Renzi v. Aleszczyk*, 44 App. Div. 2d 648, 352 N.Y.S.2d 736 (1974).

My proposed standard raises a fact question of whether a reasonable person would find that Capitol Federal had actual or constructive knowledge funds were about to be misappropriated. I am aware the facts set forth in this dissent do not always correspond with the facts set forth by the trial judge or the majority; however, the record supports the discussion of facts that follows. Summary judgment was premature because, as will be illustrated, the facts are both material and conflicting.

Martha Flanders appeared at Capitol Federal on January 13, 1988, and 20 minutes later walked out with $135,791.34 in checks, some payable to Martha Flanders and some to Martha and her husband, James Flanders.

Mrs. Flanders was taken to the desk of John Denton and, when she explained what she wanted, he took her to Joseph Morley, an assistant vice president. Morley was not acquainted with Mrs. Flanders or her husband. In fact, Morley had never met the Flanders or Mrs. Flinn, the depositor.

Mrs. Flanders presented a durable power of attorney from Mrs. Flinn dated June 15, 1987. On its face, it was apparent the document had been "clipped" from the "Family Circle" magazine issue of June 1, 1987, and the blanks had been filled in. Although not relevant to my dissent, Mrs. Flinn signed the durable power of attorney without legal advice at a time when her treating physician testified she was incompetent. The document was notarized by the same woman who, after a grant of immunity, admitted she also had notarized Mrs. Flinn's purported will,

which was forged five days after Mrs. Flinn's death and backdated to December 29, 1987.

Mrs. Flanders also had a handwritten letter signed by Mrs. Flinn, instructing that Mrs. Flinn's niece and nephew, the Flanders, had her power of attorney and that Mrs. Flinn wished to cash five certificates of deposit that she identified by number. Mrs. Flanders wanted three of the certificates of deposit cashed and a check made payable to her personally. The remaining two certificates of deposit were to be cashed and the check made payable to both Mrs. Flanders and her husband. The five certificates of deposit totalled $135,791.34, and Mrs. Flanders forfeited $4,757.70 in accrued interest in order to cash the certificates of deposit.

Morley testified by deposition that the use of a power of attorney is "an unusual occurrence at most banks. You don't see it that often. You want to pay attention to what you are doing." In its brief and at oral argument, Capitol Federal stated that it averages 500 transactions involving agency or the power of attorney relationship each day. Capitol Federal's statement, which is noted in the majority opinion, seems at odds with the deposition testimony of Morley, an assistant vice president of Capitol Federal.

All Morley did was check the signature on the durable power of attorney against the signature on the letter of instruction and the five signature cards, one signature card for each certificate of deposit. He then made out the checks. The entire procedure took less than 20 minutes.

Anyone giving the signatures even a cursory glance can see that Mrs. Flinn's signatures on the early signature cards, dated 1973 and 1982, are clear, firm, and legible. Even the signatures on the cards signed in 1986 are clear, firm, and legible. The signature on the durable power of attorney was started twice. There is only one "hump" on the "M" in "Mrs." and the word "Flinn" is not legible. The handwriting is weak and shaky. The signature on the handwritten letter of instruction (no one would contend the letter itself is in Mrs. Flinn's handwriting) is shaky and meandering.

In summary, a complete stranger entered a financial institution and a bank officer, who had never seen that person before and

who did not know the depositor, accepted a durable power of attorney that clearly shows on its face that it was clipped out of a magazine usually sold at a supermarket checkout stand. The bank then paid out a large sum of money to the holders of the power of attorney, after deducting $4,757.70 in forfeited accrued interest. The transaction was based on signatures that clearly showed a deteriorating depositor. To me, the above presents a question of fact whether a reasonable person would be put on notice that funds were about to be misappropriated.

Any inquiry could have prevented the loss. The financial institution also could have fully protected itself by drawing the checks in Mrs. Flinn's name. I cannot agree with the majority's view that, because Mrs. Flanders could have stolen the money later, Capitol Federal's lack of due caution is irrelevant. If the Flanders had deposited the funds and then written checks to themselves, Capitol Federal's duty would have ended and any negligence would be that of another institution. By not making the checks payable to Mrs. Flinn, Capitol Federal made the cashing of the checks simple. Had the checks been made payable to Mrs. Flinn, the theft might have been prevented or the funds recovered. In summary, Capitol Federal could have left Mrs. Flinn in the same position as before the transaction by making the checks for her money payable to her.

I would reverse and remand for trial.

HERD, J., joins the foregoing concurring and dissenting opinion.