(29 P.3d 448)

No. 85,654

KELLY S. GEREN, *Appellant/Cross-appellee*, v. KIMET M. GEREN, *Appellee/Cross-appellant*.

—

Opinion filed August 3, 2001.

*Richard G. Tucker*, of Parsons, for appellant/cross-appellee.

*David K. Markham*, of Markham & Jack, Chartered, of Parsons, for appellee/cross-appellant.

Before BEIER, P.J., PIERRON, J., and BUCHELE, S.J.

BEIER, J.: Plaintiff-appellant Kelly S. Geren seeks reversal of summary judgment granted in favor of his brother, defendant-appellee Kimet M. Geren. The district court found Kimet had the necessary authority under a durable power of attorney to terminate a farm lease with Kelly.

In the event that Kelly is successful on his appeal, Kimet cross-appeals the district court's other rulings that he failed to obtain valid service of the notice of termination on Kelly and that he lacked authority to terminate the lease as a successor trustee.

The lease in question began in 1988 as an oral farm lease of 250 acres between Kelly and his parents, Donald and Marjorie Geren. Donald and Marjorie later established a living trust and named themselves as co-trustees; they named Kimet as successor trustee in the event of "the death, disability or resignation of either or both" of them "so long as [he] is able to continue active service as Trustee." Under the trust instrument, the trustee had the express power to lease real estate. The trust instrument also provided:

> "6.2 **SUCCESSOR TRUSTEE**: After the death of the Grantor, then **KIMET M. GEREN** shall serve as Successor Trustee for the sole purpose of making final distribution of assets as provided in paragraph number 4.3 (above) and paying final bills.
>
> . . . .

"7.1 **ADMINISTRATION**: In the administration of the Trust Estate the Trustees shall have all of the rights with respect to the Trust Property as they would have if legal title and ownership thereof were vested in such Trustees in their individual capacity.

. . . .

"7.17 **SUCCESSOR TRUST POWERS**: All powers given to the Trustee by this instrument are exercisable by any Successor Trustee who has been appointed under this instrument in paragraph 6.2 and who is working in such appointed capacity."

On the same day that the trust was created, Marjorie executed a durable power of attorney naming Donald as her attorney-in-fact and Kimet as her successor attorney-in-fact. The pertinent provisions of the power of attorney read:

"I, **MARJORIE L. GEREN** (Principal) . . . hereby designate **DONALD R. GEREN** (Agent) [or, in the event of his inability or unwillingness to serve, KIMET M. GEREN] . . . my Attorney in fact and Agent . . . in my name and for my benefit, to exercise or perform any act, power, duty, right or obligation that I now have or may acquire, relating to any person, matter, transaction or real or personal property, now owned or later acquired by me, including the following powers:

. . . .

"To maintain, repair, improve, invest, manage, insure, rent, lease, encumber, mortgage, pledge, gift, and in any manner deal with any real or personal property, tangible or intangible, or any interest therein, that I now own or may hereinafter acquire, in my name and for my benefit, upon such terms and conditions as my [attorney-in-fact] shall deem proper;

. . . .

"This is a Durable Power of Attorney. This power of attorney shall not be affected by my subsequent disability or incapacity or lapse of time. At this time, however, I am a person having capacity to contract and am of sound mind and strength of body and therefore plan to continue management of my personal and/or business affairs so long as I am able."

Donald and Marjorie later transferred the farmland leased by Kelly to the trust. Donald died 9 months after the transfer.

Kimet assumed the role of Marjorie's attorney-in-fact in June 1997 because her health had been deteriorating. She had never been declared incompetent, incapacitated, or disabled.

On January 26, 1998, Kimet mailed to Kelly, by certified mail, a notice of termination of the farm lease, along with a proposed cash rent lease. He had signed the notice of termination as "Du-

rable Power of Attorney for Trust." The notice provided the oral lease would terminate on March 1, 1998. The notice arrived at Kelly's house, but Kelly refused to accept it when he learned it was from Kimet. The notice was returned to Kimet as refused on January 28, 1998.

Sometime in the next 2 days, Kimet placed a copy of the notice of termination and the proposed lease on the door of a trailer Kelly owned and kept in a machinery shed on the farmland at issue. Kelly lived elsewhere, but he stayed in the trailer periodically when working on the land. A third brother, Kevin, also would stay in the trailer off and on. Kevin removed the document from the door, and, without reading it, put it on the counter top in the trailer. He does not recall whether he ever talked to Kelly about finding it.

Kelly found the notice of termination in a drawer or cabinet in the trailer on February 8, 1998. As of that date, he had not prepared the land for a fall seeded crop. He also said he did not remember whether he ever talked to Kevin about the notice.

Marjorie died in March 1998.

Kelly filed suit against Kimet, alleging that Kimet was without authority to terminate the lease and that his notice of termination and service thereof was unlawful. Kimet sought summary judgment, arguing that he had authority to terminate the lease and that he properly served valid notice of the termination. Kelly also filed a motion for summary judgment.

On the cross-motions, the district judge held: (1) The purported service of the notice by certified mail was invalid; (2) the purported service by posting the notice on the door of the trailer was invalid because Kevin was not Kelly's agent for service of process, and Kevin's receipt of the notice did not comply with K.S.A. 58-2510 because he did not reside in the trailer; (3) the date of Kelly's receipt of the notice was February 8, 1998; (4) Kimet had no authority as successor trustee to terminate the lease because the successor trustee's powers were for the sole purpose of making final distribution of assets; (5) Kimet had authority under the durable power of attorney to terminate the lease; (6) the effective date of termination was March 1, 1998; and (7) given the totality of the

circumstances, Kimet substantially complied with the statutory requirements for service of the notice.

### Authority Under Power of Attorney and Trust

Kelly argues that Kimet's authority to act pursuant to the power of attorney was to arise only if and when Marjorie was found to be disabled or incapacitated and that genuine issues of material fact remained on whether such a finding had been made.

The legal effect of a written instrument is a question of law; this court has unlimited review of its resolution by the district court. *In re Estate of Sanders*, 261 Kan. 176, 181, 929 P.2d 153 (1996). If the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction. *In re Cherokee County Revenue Bonds*, 262 Kan. 941, 953, 946 P.2d 83 (1997). Furthermore, questions of law are made to order for disposition by summary judgment. See K.S.A. 2000 Supp. 60-256(c); *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 (2000).

"A power of attorney is an instrument in writing by which one person, as principal, appoints another as agent and confers upon such agent the authority to act in the place of the principal for the purposes set forth in the instrument." *Muller v. Bank of America*, 28 Kan. App. 2d 136, 139, 12 P.3d 899 (2000). A durable power of attorney is "[a] power of attorney that remains in effect during the grantor's incompetency." Black's Law Dictionary 1191 (7th ed. 1999); see also K.S.A. 58-610 (defining durable power of attorney as one containing words showing principal's intent for authority conferred to be exercisable notwithstanding principal's subsequent disability or incapacity).

Marjorie's power of attorney did not condition the attorney-in-fact's authority on a finding that Marjorie had become disabled or incapacitated. To the contrary, it simply stated that the attorney-in-fact's authority would not be affected by such an occurrence and that her plan was to continue managing her affairs as long as she was able. No finding of Marjorie's disability or incapacity was necessary for the attorney-in-fact's authority to arise. " '[T]here is no room for construction of a power of attorney which is not ambiguous or uncertain, and whose meaning and portent are perfectly

plain.' " *Bank IV Olathe v. Capitol Fed'l Savings & Loan Ass'n,* 250 Kan. 541, 549, 828 P.2d 355 (1992) (quoting 3 Am. Jur. 2d, Agency § 30, p. 534). Kelly's argument is defeated by the plain language of the document.

Kimet understood the power of attorney to give him authority to manage all of his mother's property, including the trust. The farmland had been transferred to the trust; it is unclear whether the oral farm lease had been formally transferred as well. The district judge concluded ultimately that the broad language of the power of attorney made the distinction meaningless, because it gave Kimet the authority to manage Marjorie's personal assets as well as those held by the trust for her benefit. In the district judge's view, the power of attorney enabled Kimet to terminate the farmland lease with Kelly.

For us, the critical fact is the placement of the subject real estate in the trust. Under K.S.A. 2000 Supp. 58-1204, Marjorie could not employ a durable power of attorney to delegate the entire administration of the trust to another. This was true even of Kimet, who, after succeeding his father, had become her co-trustee. The statute does not permit a surviving co-trustee or successor trustee in Marjorie's position to override the deceased grantor's choice of the person who next administers his or her assets, without following whatever procedure is set forth in the trust instrument itself.

We recognize that where, as here, the successor trustee named in the trust instrument and the attorney-in-fact to whom the surviving co-trustee would delegate are one and the same, the danger the statute seeks to neutralize is nonexistent. Still the principle is worthy of observance and protection. In many cases, the grantor's choice and the surviving co-trustee's or successor's attorney-in-fact will not be the same. We do not want this case to provide a roadmap for one who seeks to defeat the grantor's intention by means of a power of attorney. We therefore hold that Kimet lacked authority under the durable power of attorney to terminate the farm lease.

This holding requires us to evaluate Kimet's independent authority as successor trustee. He has cross-appealed the district judge's finding against him on this issue. We agree with Kimet.

As stated above, Kimet was named as his father's successor trustee. He thus became his mother's co-trustee as of the date of his father's death, and he remained her co-trustee until her "death, disability, or resignation." Under the trust instrument, the trustees had the power to make decisions on real estate, including its lease. Kimet, as at least co-trustee during his mother's lifetime and possibly as sole successor trustee for each of his parents after her implicit resignation due to poor health, had the authority to terminate the oral farm lease to Kelly.

Kimet's powers were not, as Kelly argues and the district judge agreed, limited to those listed in Paragraph 6.2 of the trust instrument, which restricted the successor trustee to "making final distribution of assets . . . and paying final bills." When the trust instrument is read as a whole, it is evident those limitations were not designed to arise until after the death of both of the original grantors. Marjorie did not die until March 1998. Until her death, she and Donald's successor were responsible for administering the trust to provide for her. This is exactly what Kimet was attempting to do by terminating the oral lease and attempting to enter into a cash rent lease with Kelly.

### Sufficiency of Notice

Kelly also argues the trial court erred in finding Kimet substantially complied with statutory requirements for the service of notice of termination of a farm tenancy. Whether notice of termination of a farm tenancy complies with the statute is a question of law. *Buckle v. Caylor*, 10 Kan. App. 2d 443, 444, 700 P.2d 979 (1985). This court's review is therefore unlimited. See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

The fundamental rule of statutory interpretation is that the intent of the legislature governs if that intent can be ascertained. 263 Kan. at 879. This court will presume that a statute was not intended to produce absurd consequences and that it has the most reasonable operation its language permits. *Mendenhall v. Roberts*, 17 Kan. App. 2d 34, 42, 831 P.2d 568, *rev. denied* 251 Kan. 939 (1992). Furthermore, this court will not give a statute an arbitrary construction but will instead construe it in a manner to "advance

the sense and meaning fairly deducible from the context." 17 Kan. App. 2d at 42.

An initial matter requires brief discussion. Kelly spends an inordinate amount of time emphasizing that K.S.A. 58-2506(a) is applicable to this case, apparently believing the district judge incorrectly applied K.S.A. 58-2506(c). Our review of the record persuades us that the district judge did not make this mistake.

Subsection (a) of the statute governs when the tenant has neither planted a fall seeded crop nor prepared the ground for such. See *Orebaugh v. Leatherwood*, 27 Kan. App. 2d 730, 733, 8 P.3d 55 (2000). That is the situation here. In such a case, "notice to terminate . . . must be given in writing at least 30 days prior to March 1 and must fix the termination of the tenancy to take place on March 1." K.S.A. 58-2506(a).

Kelly points out that he did not receive actual notice of the termination until he found the written notice in the trailer on February 8, 1998, 9 days short of the 30 days before March 1 that the statute requires.

K.S.A. 58-2510 provides:

"Notice as required in the preceding sections may be served on the tenant, or, if the tenant cannot be found, by leaving a copy thereof at the tenant's usual place of residence, or by delivering a copy thereof to some person over 12 years of age residing on the premises, or, if no person is found upon the premises, by posting a copy of the notice in a conspicuous place thereon, or by registered mail, registered mail return receipt requested, or certified mail, return receipt requested, addressed to the tenant at the tenant's usual place of residence."

Kimet first attempted service by certified mail. Obviously, had Kelly accepted the certified letter when it was delivered to him, he would have received actual and proper notice under K.S.A. 58-2506(a) and K.S.A. 58-2510. Unfortunately, these statutes do not set forth the procedure to be followed when a tenant refuses the certified mail containing the notice.

The district judge attempted to fill this gap by looking to K.S.A. 60-303 in the general code of civil procedure. At the time, K.S.A. 60-303(b) provided that service could be obtained after a refusal of certified mail by sending "a copy of the process and petition or other document to be served to the defendant by ordinary, first-

class mail. . . . Service shall be considered obtained upon the mailing by ordinary, first-class mail." This section did not help Kimet because he did not follow Kelly's refusal of the certified mail notice with service by ordinary, first-class mail.

The district judge also held that Kimet failed to comply with that portion of K.S.A. 58-2510 permitting service by delivery of a copy of the notice "to some person over 12 years of age residing on the premises, or, if no person is found upon the premises, by posting a copy of the notice in a conspicuous place thereon." Although Kevin was over 12 years of age, he did not reside on the "premises." In addition, the court apparently believed K.S.A. 58-2510 required that the posting of the notice must be on Kelly's residence rather than on the farmland under lease.

Kimet argues that the "premises" to which K.S.A. 58-2510 refers is the leased farmland rather than the tenant's residence. If this is so, and the door of the trailer constituted a conspicuous place on that land, Kimet's second attempt at service on Kelly was valid and timely under K.S.A. 58-2506(a).

We are persuaded that Kimet is correct. The legislature's use of both "premises" and "residence" in K.S.A. 58-2510 appears to have been deliberate. A review of the common definitions of these terms reinforces our experience that their meanings are distinct. Compare Webster's Third New International Dictionary 1789 (3d ed. 1986) ("premises" equals "a specified piece or tract of land with the structures on it"); Black's Law Dictionary 1199 (7th ed. 1999) ("premises" equals "[a] house or building, along with its grounds"); with Webster's at 1931 ("residence" is "a building used as a home"); Black's at 1310 ("residence" is "[t]he place where one actually lives, as distinguished from a domicile . . . . [a] house or other fixed abode; a dwelling").

We are also satisfied that the trailer door, given the uncontroverted evidence that Kelly used it as his home away from home, was "conspicuous" under 58-2510. Kevin's removal of the notice from the door and its subsequent temporary disappearance inside the trailer are matters for review and debate between Kelly and Kevin, but Kimet had already done his part to see that Kelly received the notice to which he was entitled under the statutes.

Because we dispose of this issue on the basis that valid service was obtained by posting the notice on the trailer door, we do not reach the district court's application of the doctrine of substantial compliance. That analysis may be another correct avenue to the same result. Although we differ from the district judge on the proper path, we reach the same destination. Kimet had authority to terminate the oral farm lease, and his service of notice to Kelly was adequate as a matter of law. Summary judgment was appropriate. See *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 118, 936 P.2d 714 (1997) (trial court's reason for decision immaterial if ruling correct for any reason).

Affirmed.